**GRIFFIN HAMERSKY LLP**
420 Lexington Avenue, Suite 400
New York, New York 10170
Telephone: (646) 998-5580
Facsimile: (646) 998-8284
Scott A. Griffin
Michael D. Hamersky

Proposed Counsel for the Debtors
and Debtors In Possession

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X

| | : | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | (Subchapter V) |
| VTES, INC., *et al*., | : | |
| | : | Case No. 20-_____ ( ) |
| Debtors.[1] | : | |
| | : | (Joint Administration Requested) |

-------------------------------------------------------------X

## CHAPTER 11 PLAN OF VTES, INC. *ET AL*., UNDER
## <u>SUBCHAPTER V OF CHAPTER 11 OF THE BANKRUPTCY CODE</u>

---

[1] The Debtors in these Chapter 11 Cases are VTES, Inc., Savari, Inc., and Savari Systems Pvt. Ltd. The last four digits of VTES, Inc. and Savari, Inc.'s federal tax identification numbers are 3188 and 9745, respectively. The last four digits of Savari Systems Pvt. Ltd.'s registration number are 8251. The Debtors' mailing address is 2005 De La Cruz Boulevard, Suite 111, Santa Clara, California 95050.

# TABLE OF CONTENTS

**Page**

INTRODUCTION                                                                                         1

ARTICLE I. DEFINITIONS AND INTERPRETATION
    Section 1.1 Definitions                                                         9
    Section 1.2 Rules of Interpretation and Time Periods                            16
    Section 1.3 Application of Definitions and Rules of Construction
        Contained in the Bankruptcy Code                                 17

ARTICLE II. CLASSIFICATION OF CLAIMS AND INTERESTS
    Section 2.1 Classification and Treatment Generally                              17
    Section 2.2 Unclassified Claims – Administrative Claims and
        Priority Tax Claims                                              17
    Section 2.3 Criterion of Class                                                  17
    Section 2.4 Debtors Claims and Interests                                        18

ARTICLE III. IDENTIFICATION OF IMPAIRED CLAIMS AND INTERESTS UNDER THE PLAN
    Section 3.1 Impaired Classes of Claims                                          18
    Section 3.2 Impairment Controversies                                            18

ARTICLE IV. SUBCHAPTER V PLAN CONFIRMATION REQUIREMENTS
    Section 4.1 Best Interest of Creditors – Liquidation Analysis                   19
    Section 4.2 The Plan is Fair and Equitable                                      19
    Section 4.3 Plan Feasibility                                                    20

ARTICLE V. PROVISIONS FOR TREATMENT OF UNCLASSIFIED CLAIMS UNDER THE PLAN
    Section 5.1 Unclassified Claims                                                 21
    Section 5.2 Treatment of Administrative Claims                                  21
    Section 5.3 Treatment of Priority Tax Claims                                    22
    Section 5.4 Treatment of Classified Claims and Interests                        22
    Section 5.5 Reservation of Rights Regarding Claims                              24

ARTICLE VI. ACCEPTANCE OR REJECTION OF THE PLAN; EFFECT OF REJECTION BY ONE OR MORE CLASSES OF CLAIMS OR INTERESTS
    Section 6.1 Classes Entitled to Vote                                            25
    Section 6.2 Class Acceptance Requirement                                        25

ARTICLE VII. IMPLEMENTATION OF THE PLAN
    Section 7.1 Sale                                                                25
    Section 7.2 Plan Funding Mechanism                                              25
    Section 7.3 Establishment of Reserves                                           25
    Section 7.4 Corporate Action                                                    26
    Section 7.5 Closing of the Chapter 11 Cases                                     26
    Section 7.6 Winding Down of Affairs                                             26

Section 7.7 Powers and Duties of Trustee 26
Section 7.8 Appointment of the Trustee 26
Section 7.9 Distributions to Holders of Claims and Interests 26
Section 7.10 Miscellaneous Distribution Provisions 30

ARTICLE VIII. EFFECT OF THE PLAN ON CLAIMS AND INTERESTS AND CAUSES OF ACTION
Section 8.1 Binding Effect 33
Section 8.2 Terms of Injunctions or Stays 33
Section 8.3 Causes of Action 33
Section 8.4 Injunctions 33
Section 8.5 Exculpation 34
Section 8.6 Compromise of Controversies 35
Section 8.7 Releases by the Debtors 35
Section 8.8 Post-Confirmation Activity 35

ARTICLE IX. EXECUTORY CONTRACTS
Section 9.1 Executory Contracts and Unexpired Leases 36
Section 9.2 Rejection Damages Bar Date 37
Section 9.3 Effect of Post-Confirmation Rejection 37

ARTICLE X. CONDITIONS TO CONFIRMATION AND OCCURRENCE OF EFFECTIVE DATE
Section 10.1 Conditions to Confirmation 37
Section 10.2 Conditions to Occurrence of Effective Date 37
Section 10.3 Effect of Nonoccurrence of the Conditions to Occurrence of the Effective Date 38

ARTICLE XI. CONFIRMABILITY AND SEVERABILITY OF PLAN
Section 11.1 Confirmability and Severability of Plan 38

ARTICLE XII. ADMINISTRATIVE PROVISIONS
Section 12.1 Retention of Jurisdiction 39
Section 12.2 Governing Law 40
Section 12.3 Effectuating Documents, Further Transactions 40
Section 12.4 Waiver of Bankruptcy Rules 3020(e) and 7062 40
Section 12.5 Discharge 41
Section 12.6 Headings 41
Section 12.7 Governmental Carve-out 41
Section 12.8 Disposal of Books and Records 41
Section 12.9 Amendments 41
Section 12.10 Successors and Assigns 41
Section 12.11 Confirmation Order and Plan Control 42
Section 12.12 Further Action 42
Section 12.13 Exhibits 42
Section 12.14 Notices 42
Section 12.15 Substantial Consummation 43
Section 12.16 Deemed Acts 43

# INTRODUCTION[2]

VTES, Inc. and its affiliated debtors and debtors in possession (collectively, the "Debtors"), propose the following chapter 11 plan. The Debtors are the proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code.

Pursuant to section 1190 of the Bankruptcy Code, this plan provides a discussion of the Debtors': (a) history, business operations, capital structure, events leading to their decline, and their restructuring efforts; (b) liquidation analysis; and (c) ability to satisfy payments proposed under the Plan.

The Plan also provides other pertinent information and details regarding, *inter alia*, the treatment of claims and interest under this Plan and the means for its implementation. Any agreements and documents which are referenced in the Plan are incorporated as if set forth in full therein and will be filed with the United States Bankruptcy Court for the Southern District of New York, as applicable.

This Plan is a contract between the Debtors and all of their creditor constituencies. It provides the mechanism, timing, and details of all treatment and payment of creditor claims. The information contained in this document is designed to provide creditors of the Debtors with information to enable them to make an informed judgment concerning the method by which the Debtors plan to wind down their affairs and provide recoveries to creditors. If the Bankruptcy Court confirms the Plan, it will be binding on the Debtors, their creditors, equity holders, and other interested parties.

As discussed in greater detail below, the Plan will be funded from the proceeds generated by a sale of substantially all of the Debtors' assets. The Plan contemplates (i) the payment of all Allowed Secured Claims, Allowed Administrative Claims and Allowed Priority Claims in full; and (ii) distributions to creditors holding Allowed General Unsecured Claims at the conclusion of the Debtors' Claims Reconciliation Process. The Debtors estimate that following the Claims Reconciliation Process the holders of Allowed General Unsecured Claims against the Debtors will receive distributions under the Plan on account of such holder's Allowed General Unsecured Claim.[3]

The Debtors submit that Confirmation of the Plan will provide the best possible return to holders of Claims against the Debtors and is in the best interests of the Debtors, their creditors and their bankruptcy estates.

***THE DEBTORS STRONGLY RECOMMEND THAT YOU VOTE IN FAVOR OF THIS PLAN***.

---

[2] Capitalized terms used in this introduction, but not otherwise defined herein, shall have the meanings ascribed to them in the body of the Plan.

[3] The Plan is a "pot plan," meaning that a lump sum will be available to holders of General Unsecured Claims, each of whom will receive a pro rata distribution from the "pot."

## Company Overview

Founded in 2008, the Debtors and their non-debtor affiliates (collectively, the "Company"),[4] *inter alia*, build and market software and hardware sensor solutions for OEM automotive car manufacturers, automotive Tier 1 suppliers, "smart cities,"[5] and pedestrians and cyclists with the vision of making transportation more predictable, safe and more efficient. The Company has been a pioneer in connecting cars and smart infrastructure. From its beginnings as a research and innovation hub, the Company has grown to be a major supplier to international test beds for connecting cars and infrastructure.

With more than 150 combined years of "V2X" learning and development, and 15 million-plus miles per year of public testing, the Company is an industry leader in V2X technology.[6] As of November 30, 2020, the Company's gross revenue was approximately $1.5 million.

## Company History

The Company's business operations during its early years were directed, in large part, towards the research and development of V2X technology in the form of software and hardware. During these years, the Company's customers included: (a) research facilities and municipal agencies, such as the University of California, Berkeley and the California Department of Transportation; (b) industry consortiums, such as the Crash Avoidance Metrics Partnership ("CAMP"), which included the world's top automotive companies – *e.g*, Ford, General Motors and Toyota; and (c) research proving grounds, such as the University of Michigan Transportation Research Institute, the Virginia Tech Transportation Institute, and Maricopa County, Arizona. Accordingly, as a result of the Company's early involvement in V2X research, it was primed to pivot to pursuing smart city deployments using its V2X technology. Indeed, when the USDOT authorized approximately $40 million in funds for three smart city projects, the Company was awarded contracts for two of those projects – the smart city project with (a) the Tampa Hillsborough Expressway Authority (the "THEA") in Tampa, Florida; and (b) the smart

---

[4]  The Debtors' non-debtor affiliates are: (i) Savari HK Limited and Shanghai Savari Technology, Co. Limited ("SSTC"), entities organized under the laws of China; and (ii) Savari GmbH, an entity organized under the laws of Germany. In October and November of 2020, the Company respectively ceased its business operations in China and Germany. For purposes of this Plan, "Company" shall refer to the collective business enterprise of the Debtors and the non-debtor entities.

[5]  Smart cities are cities that utilize a framework, predominantly composed of information and communication technologies to develop, deploy, and promote sustainable development practices to address growing urbanization challenges and improve the quality of life for citizens. In 2018, the Company made a decision to pause its smart cities business operations.

[6]  Vehicle-to-everything communications, commonly known in the technology sector as V2X, is a wireless technology aimed at enabling data exchanges between a vehicle and its surroundings. V2X communications include: "V2V," vehicle-to-vehicle communications; "V2I," vehicle-to-infrastructure communications; "V2P," vehicle-to-phone for pedestrians; and "ISP," infrastructure-to-phone. Initially, in the United States, V2X research was initiated and funded by the United States Department of Transportation or "USDOT."

city project associated with New York City's connected vehicle pilot (the "CVP") administered by the New York City Department of Transportation ("NYCDOT").[7]

Significantly, the Company believed that a notice of proposed rule-making ("NPRM") governing the more wide-spread use of V2X technology for smart cities would spur a pervasive demand for the Company's V2X technology. Although the NPRM for V2X technology was scheduled to be signed in late 2016 or early 2017, the NPRM was indefinitely postponed by the federal government. By 2018, due to delays in smart city deployments and the upswing in automotive OEM interest in V2X technology, the Company made the decision to pivot its focus away from smart cities engagements, and instead focus on business opportunities in the automotive OEM sector - either directly or through the Tier-1 system. The Company also began to focus on V2X technology relating to infrastructure – specifically, software and hardware for interface and V2X data transmission via traffic signals and sensors on roadways, and cloud and data management relating to such technology.

### The Debtors' Organizational Structure

VTES, Inc. ("VTES"), a New York corporation, and Savari Services Pvt. Ltd. ("SSPL"), an Indian private limited company, are wholly owned subsidiaries of Savari, Inc. ("Savari"), a California corporation.

### The Debtors' Business Operations

Headquartered in Santa Clara, California, the Debtors have 64 employees with current operations located in the United States and India.[8] As noted above, the Company is an industry leader in the V2X technology sector, with operations that include the development of technology for the OEM automotive market, Tier 1 suppliers, smart cities and pedestrians. The Company's business operations include contracts and/or other business relationships with some of the world's most recognizable companies including, but not limited to, Aptiv, AT&T, Audi, BMW, Bosch, Continental, Desay SV Automotive, Ford, General Motors, Harman International ("Harman"), Marsh Electronics, and Qualcomm. These relationships include the Company's direct and/or indirect licensing of its V2X technology to be integrated by customer-companies in various multipurpose car communications systems. Since its founding, the Company has equipped more than 5,000 vehicles with integrated hardware and software relating to its V2X technology.

As discussed above, the Company's V2X technology is also produced for infrastructure use relating to interface and V2X data transmission through traffic signals and roadway sensors. The Company's business operations also involve the development of cloud and data management software relating to the use of their V2X technology.

---

[7]   In connection with the project for THEA, the Company supplied THEA with hardware devices and associated software utilizing the Company's V2X technology. Similarly, in conjunction with the CVP project, the Company supplied the NYCDOT with hardware devices and associated software and services also using its V2X technology. As discussed in greater detail below, the Company ultimately abandoned the engagement associated with the CVP project.

[8]   The Debtors have 54 employees in India and 10 employees in the United States.

*The OEM Automotive Market Business*

For nearly a decade, the Debtors have provided their V2X technology to OEMs in the United States and Europe through a variety of contractual and other business arrangements. As noted above, in 2008, the Debtors began their V2X technology work in the United States working in coordination with the USDOT and the Company's various customer and partner-entities. In 2016, the Debtors began providing such technology in Europe.

The Debtors license their "V2X middleware" technology along with multiple safety applications to car manufacturers, including OEMs developing autonomous and self-driving cars. The Debtors' V2X middleware technology provides OEMs with additional sensors and more accurate predictive analytics for such cars, and is unique in that: (a) unlike other sensor technologies, its software does not require line of sight of the environment (road, intersections or any object); (b) provides an increased level of driving accuracy, especially in hazardous conditions; and (c) enables cars to communicate with other vehicles (V2V), infrastructure (V2I) and pedestrians (V2P) up to a mile away. Specific examples of the Debtors' V2X middleware technology includes:

- *V2V Technology* - electronic emergency brake light, forward collision warning, blind spot warning, intersection movement assist, lane change advisory, left turn assist, and do not pass warning technology;

- *V2I Technology* - curve speed warning, work zone warning and in-vehicle signal phase and timing visualization technology; and

- *V2P Technology* - technology enabling cars to identify pedestrians crossing streets in unpredictable situations and alerts drivers through an application displayed either on a smartphone or on In-Vehicle-Infotainment systems.

*The Debtors' Automotive Tier 1 Business Operations*

The Debtors' automotive business segment works with Tier-1 suppliers in the automotive industry to equip cars with V2X systems based initially on dedicated short range communications ("DSRC"), and subsequently with C-V2X (cellular vehicle-to-everything) sensors and predictive and life-saving V2X applications. In conjunction with their Tier 1 business operations, the Debtors also support Tier-1 suppliers in supplying automotive OEMs with middleware and applications for autonomous and self-driving cars utilizing certain of the Debtors' V2X middleware technology and applications.

*The Debtors' Smart Cities & Pedestrian Business Operations*

As disruptive transportation trends, such as shared mobility and automation of cars become prevalent in urban areas, the Debtors have worked with cities and city administrations to deploy life-saving V2X technology. Notably, the Debtors have already developed and deployed their V2X technology in cities in the United States, including Ann Arbor, Michigan; Washington, DC; Anthem, Arizona; Palo Alto and Sunnyvale, California; and Blacksburg, Virginia. The Debtors have also developed and deployed such V2X technology in Shanghai, China.

Although the Debtors have temporarily shifted their focus away many of their smart city projects due to the governments pause on the issuance of the NPRM V2X technology, they nevertheless continue to work with the USDOT regarding such technology. For example, the Debtors, in conjunction with the USDOT, developed the "SmartCross" app for smartphones (an app that alerts pedestrians when it is safe to walk, and enables pedestrians to request the pedestrian crossing signal).

*The Intercompany SSPL Master Services Agreement*

A majority of the Debtors' business operations are facilitated through a key intercompany services agreement with SSPL. The Debtors' V2X technology is created through a software development arrangement under that certain Master Services Agreement, dated April 1, 2012 (the "MSA"), between Savari and SSPL. Under the MSA, SSPL provides software development to Savari for the Company, including design services and quality analysis and checks relating to the Debtors' V2X technology. Additionally, pursuant to the MSA, SSPL provides finance, human resource, administration and IT services relating to certain of the Company's operations. The fees charged by SSPL under the Master Services Agreement are at rates considered to be reasonable by Savari. Additionally, the rates are defined by a cost-plus model that complies with Indian law. The Master Services Agreement has an indefinite term, but may be terminated by either Savari or SSPL upon sixty (60) days-notice.

The Master Services Agreement is necessary and critical for the smooth and orderly operation of the Debtors' business.

**The Debtors' Capital Structure**

The Debtors have approximately $ 1,515,152.00 in aggregate secured debt consisting of a secured loan financing between Silicon Valley Bank and Savari.

In addition, the Debtors have approximately $7.6 million in aggregate unsecured current liabilities, including: (a) $5 million in convertible notes with General Motors Ventures LLC ("GM Ventures"); (b) $498,725 in convertible notes with Flextronic Automotive Sales and Marketing, Ltd.; (c) a $342,450 SBA Paycheck Protection Program Loan from the federal government (the "PPP Loan"); (d) a $10,000 Economic Injury Disaster Loan advance from the

federal government; and (e) $1.7 million in trade payables, counterparty contract claims, and certain employee related claims.[9]

The Debtors have approximately 16,000 shares of issued and outstanding common stock and approximately 29,000 shares of issued and outstanding preferred stock (15,000 shares of issued and outstanding Series A preferred stock and 14,000 shares of issued and outstanding Series B preferred stock).

## **Circumstances Leading to These Chapter 11 Cases**

### *Decline in Financial Performance*

The decline in the Debtors' business may be attributed to a number of events. The first event adversely impacting business operations was the failure of the National Highway Traffic Safety Administration ("NHTSA") to issue the V2X mandate that was supposed to be derived from the V2X technology NPRM. Indeed, the federal government not issuing the NPRM for this technology relating to smart cities and all new vehicles to be sold in the U.S. eliminated an expected large uptick in demand for the Company's V2X technology and services. The Company's Series A round of funding anticipated the NPRM as a stimulus to its business forecast which ultimately did not materialize. The nature of this first round of funding was premised on the belief that federal government mandates concerning the rules for the use of V2X technology would accelerate the adoption of such technology. However, the lack of the NPRM and the numerous corresponding customer funding delays for smart city programs ultimately led to the Company's pivot from the smart cities market in 2018. This lack of revenue, in turn, led to the Company's need for additional funding – funding coming in the form of the Company's Series B round of fund raising, but funding that never materialized under the Company's contemplated Series C capital raise.

In addition to the decline in business caused by the lack of funds anticipated from the use of the Debtors' V2X technology with smart cities programs, the Company was forced to abandon its successful bid for the aforementioned New York City CVP project, a bid for which it had purchased $2 million of components and expended hundreds of thousands of dollars on engineering development. The Company's withdrawal from the project was a result of, among other things, delays in project funding and a demand by the City of New York that the Company indemnify it against any and all damages relating to the Company's technology or related services. The Company simply could not comply with the terms of this engagement, and ultimately was left with a large inventory and no viable recourse against the City of New York. The Company's forced abandonment of this project caused a significant impact to both the Debtors' cash position and productivity (productivity relating to engineering assets that were dedicated to the CVP and not being used on revenue bearing projects).

---

9 GM Ventures holds more than 20% of the outstanding shares of Savari, rendering it an affiliate of the Debtors pursuant to section 101(2) of the Bankruptcy Code. Thus, GM Ventures' debt is not included as part of the $7.5 million debt cap under section 1182(1) of the Bankruptcy Code with regards to the Debtors' eligibility as debtors under subchapter V of chapter 11 of the Bankruptcy Code.

A further cause for the decline in business resulted from changes required by the Federal Communications Commission concerning the radio type and spectrum allocated to V2X technology. Prior to the FCC's changes, the legacy radio was DSRC, which occupied a radio spectrum reserved only for use by V2X technology. The new radio format known as C-V2X (cellular vehicle-to-everything) is part of the United States' emerging 5G LTE standards. Although the Company was able to successfully make the change to the new radio format and is now a leader in this technology as well as the legacy version, the required change caused considerable delays in program rollouts and specifications, as well as the expenditure of substantial time and dollars of R&D.

Additionally, the launch of automotive OEM production programs that will include the Debtors' V2X technology was also delayed for a number of years. Similar to the issues concerning the smart cities programs, the stalled launch of automotive OEM programs was also driven by the delay in the V2X technology NPRM, and the uncertainty caused by the FCC's radio change referenced above. Notwithstanding the delays, the Company was able to book $16 million worth of automotive OEM royalty business, however, these orders will not generate revenue until late 2022 – when the cars utilizing the Debtors' V2X technology go into production.

The above events caused the Debtors' payroll expenditure for both infrastructure and automotive personnel to greatly exceed the accounts received for their V2X technology and related services. This, in turn, detrimentally impacted the Debtors' cash position and operations.

*Cost Reduction Initiatives*

In an attempt to right-size their financial and operational affairs, the Debtors engaged in a series of cost reduction measures. These cost reduction efforts are set forth below.

### Closing of Offices and Reduction in Force

In an effort to stabilize its business, the Company closed its offices and ceased its operations in Detroit, Michigan; Munich, Germany; and Shanghai, China. Additionally, the Debtors have terminated their corporate office lease in Santa Clara, California, which is now on a month-to-month lease arrangement for the small physical lab area needed to ship product to customers. As a further component of their cost reduction efforts, the Debtors laid of staff at their headquarters in Santa Clara, California and their office in Detroit, in addition to the employees that were laid off in connection with the Company's foreign office closures.[10] In addition to these reductions in force, the Debtors have reduced their payroll expenses through the implementation of employee furloughs beginning in August 2020.

### Miscellaneous Cost Saving Measures

As a further means of preserving liquidity, the Debtors have cancelled all trade show and promotional expenses, and have eliminated all travel since March 2020. Additionally, the

---

[10] As noted above, the Company closed its offices in Germany and China, and in conjunction therewith laid off all of its staff in those offices.

Debtors have terminated all trade services that are not essential to their basic operations (*i.e.,* janitorial, market services, etc.).

<u>*The Debtors' Restructuring Efforts and Sale Process*</u>

Notwithstanding major cost reduction efforts, and efforts to permit the Debtors to continue as a going concern, the Debtors' cash position remains severely distressed. The Debtors are continuing to lose cash at a rate that would require that they cease operations imminently if they are unable to consummate the sale of their assets in a court-supervised transaction.

### Capital Raise and Loan Efforts

In 2019, the Company raised interim funding of $5.5 million in the form of notes and warrants. Additionally, in 2019, the Company retained Raymond James, as its investment bankers, to assist the Company in pursuing various alternatives for raising additional capital for the Company. The Company and Raymond James began a process to explore strategic alternatives, including for instance minority and majority investments (either via debt, equity or both) or in connection with a sale. Strategic parties contacted included automotive and technology companies. Financial parties contacted included private equity firms, hedge funds, traditional investors and specialty investors. The Company and Raymond James decided a Series C capital raise would offer the Company the best opportunity to raise the funds that it desperately needed for operations – specifically, $20 million to reach a cash flow positive position within eighteen (18) months of the raise.

Accordingly, in the third quarter of 2019, the Company (through Raymond James) contacted approximately 500 strategic and financial parties in the United States, the European Union and China that it believed would be interested in participating in the Company's Series C funding. Unable to attract investors, in large part due to investor cash constraints as a result of the COVID-19 pandemic, the Company reduced its target raise to $12 million in the second quarter of 2020. Although the Company was able to garner support with a lead investor and one other interested party, it was unable to fill the Series C funding round. Unable to obtain the Series C funding, the Company applied for and received a $342,500 PPP Loan. The PPP Loan served as a stop-gap measure, allowing the Debtors to maintain payroll for employees in the United States.

### The Sale Process

In the beginning of the third quarter of 2020, the Company and Raymond James shifted its capital raise strategy and focused exclusively on marketing its assets for sale. In conjunction with the sale process Raymond James contacted 77 potential financial and strategic buyers (the "Initial Parties"). Of the Initial Parties, approximately 25 expressed interest with 5 of those interested parties signing non-disclosure agreements (the "Interested Parties"). The Interested Parties were provided access to a comprehensive data room, containing the Company's key financial and operational information, and all of its relevant organizational and corporate documents. Of the Interested Parties, one party, Harman engaged in specific negotiations with

respect to entering into a transaction with the Debtors for a going concern acquisition of substantially all of the Debtors' assets.

Accordingly, in November 2020, the Debtors and Harman began negotiating the terms of a going concern sale, with the parties exchanging various draft letters of intent outlining the prospective terms and conditions of the acquisition. On December 27, 2020, the parties finalized their negotiations and entered into the Asset Purchase Agreement for the sale of substantially all of the Debtors' assets. Harman has agreed, subject to court approval, to provide the Debtors' postpetition debtor-in-possession financing pending the Sale.[11]

The Debtors believe that their entry into the Asset Purchase Agreement will provide creditors with far greater recoveries than a liquidation – which the Debtors believe is imminent if they are unable to consummate the Sale. Significantly, as noted above, the Debtors believe that the proceeds generated from the Sale will provide for meaningful recoveries to holders of Allowed Claims in these Chapter 11 Cases. Further, given the extensive marketing process that the Debtors conducted prior to the commencement of these Chapter 11 Cases, the Debtors do not believe that further marketing of their assets would attract additional interested parties that would be willing to consummate the Sale on terms more favorable to the Debtors' Estates than those proposed in the Asset Purchase Agreement. Significantly, the Debtors believe that an undue delay in the consummation of the Sale or Harman's withdrawal therefrom would likely lead to a near-term cessation of the Debtors' operations and liquidation of their business, all to the detriment of the Debtors' employees, creditors and other parties in interest.

Accordingly, the Debtors believe an expedited timeline is appropriate to effectuate a prompt, yet court authorized plan-sale of the business as a going concern, and to maximize the value of the Assets for all parties in interest in these cases.

## ARTICLE I.

## DEFINITIONS AND INTERPRETATION

**Section 1.1** **Definitions**.

The following terms, when used in this Plan or any subsequent amendments or modifications thereof, and in addition to those terms defined in the text of the Plan, shall have the respective meanings hereinafter set forth.

1.01. "<u>Accounts Receivable Payments</u>" means any "Accounts Receivable Payments" paid to the Estates pursuant to, and as defined in, the Asset Purchase Agreement.

1.02. "<u>Acquired Assets</u>" means the assets to be acquired pursuant to the Sale Transactions contemplated under the Asset Purchase Agreement.

---

[11] Immediately prior to and during their negotiations with Harman, the Debtors attempted to obtain financing from private lending institutions to fund operations. The Debtors' requests for financing were either rejected outright, or the financing proposals were on terms that were commercially unreasonable.

1.03.    Administrative Claim" means any Claim under sections 503(b) and 507(a)(2) of the Bankruptcy Code, including, without limitation:  (a) the actual, necessary costs and expenses incurred by the Debtors after the Petition Date of preserving the Estates or operating the Debtors' business; (b) Allowed Claims pursuant to section 503(b)(9) of the Bankruptcy Code; and (c) any Allowed Claims that are entitled to be treated as Administrative Claims pursuant to a Final Order of the Bankruptcy Court.

1.04.    "Administrative Claims Bar Date" means the date that is thirty (30) days after notice of entry of the Confirmation Order is filed with the Bankruptcy Court or such later date as may be established by order of the Bankruptcy Court.

1.05.    "Allowed" with respect to a Claim, means the extent to which a Claim: (a) is not disallowed or expunged by stipulation or Final Order of the Bankruptcy Court; (b) is not objected to within the period fixed by the Plan or established by the Bankruptcy Court, if the Claim (i) was scheduled by a Debtors pursuant to the Bankruptcy Code and the Bankruptcy Rules in a liquidated amount and not listed as contingent, unliquidated, or disputed, or (ii) was timely filed (or deemed timely filed) pursuant to the Bankruptcy Code, the Bankruptcy Rules, or any applicable orders of the Bankruptcy Court; (c) for which an objection has been filed, but such objection has been withdrawn or determined by a Final Order (but only to the extent such Claim has been allowed); (d) determined to be valid by the Trustee; or (e) is otherwise allowed by Final Order, including, without limitation, the Confirmation Order, after notice and a hearing. A proof of Claim that is not timely filed (or not deemed timely filed) shall not be "Allowed" for purposes of distribution or voting under the Plan.

1.06.    "Assets" means all assets of the Debtors of any nature whatsoever, including, without limitation, all property of the Estates pursuant to section 541 of the Bankruptcy Code, Cash (including the Sale Proceeds), Causes of Action, tax refunds, claims of right, interests and property, real and personal, tangible and intangible, and proceeds of all of the foregoing.

1.07.    "Asset Purchase Agreement" means that that certain Asset Purchase Agreement for the sale of substantially all of the Debtors' Assets between the Debtors and Buyer, dated December 27, 2020, together with all exhibits, appendices, supplements, documents, and agreements ancillary thereto, in each case as amended, modified, or supplemented from time to time.

1.08.    "Assigned Contracts" means any executory contracts and unexpired leases assumed by the Debtors and assigned to Buyer pursuant to the Confirmation Order and the Asset Purchase Agreement.

1.09.    "Assumption Schedule" means the schedule of Assigned Contracts, which shall include proposed Cure Amounts, which is attached as Schedule 9.1 of the Plan, as such schedule may be amended, modified, or supplemented from time to time by the Debtors, which schedule shall be acceptable to Buyer.

1.10.    Available Cash" means, (i) any Cash Distributions held in the Disputed Claims Reserve Account for the benefit of a holder of a Disputed Claim, which is subsequently

Disallowed, in whole or in part; (ii) any *de minimis* Distributions; (iii) any amount represented by an undeliverable Distribution; or (iv) any voided checks.

1.11.   "<u>Bankruptcy Code</u>" means title 11 of the United States Code, as amended, in effect and applicable to the Chapter 11 Cases concerning the Debtors.

1.12.   "<u>Bankruptcy Court</u>" means the United States Bankruptcy Court for the Southern District of New York or such other court having jurisdiction over the Chapter 11 Cases.

1.13.   "<u>Bankruptcy Rules</u>" means the Federal Rules of Bankruptcy Procedure, as promulgated by the Supreme Court of the United States, as amended, in effect and applicable to the Chapter 11 Cases.

1.14.   "<u>Bar Date</u>" means (i)[ _____, 2021], the date fixed by the Bankruptcy Court as the last date by which all Persons and entities must have filed proofs of claim against the Debtors and (ii)[ _____, 2021], the date fixed by the Bankruptcy Court as the last date by which all governmental entities must have filed proofs of claim against the Debtors, unless the Bankruptcy Court has set a different date by which a specific Creditor must file a proof of Claim, in which case it means, for the specific Creditor, such different date set by the Bankruptcy Court in the order approving such Bar Date or otherwise.

1.15.   "<u>Business Day</u>" means any day other than a Saturday, Sunday or other day on which commercial banks in New York City are required or authorized by law to be closed.

1.16.   "<u>Buyer</u>" means Harman Becker Automotive Systems, Inc.

1.17.   "<u>Cash</u>" means cash and cash equivalents in U.S. dollars.

1.18.   "<u>Causes of Action</u>" means any and all Claims, rights, actions, choses in action, suits, causes of action, Liens, judgments and damages belonging to the Debtors or their Estates and any and all liabilities, obligations, covenants, undertakings and debts owing to the Estates, whether arising prior to, or after, the Petition Date and in each case whether known or unknown, in law, equity or otherwise, including, without limitation, receivables and those Claims and actions to avoid or recover pre-petition or post-petition transfers of money or property pursuant to applicable bankruptcy and non-bankruptcy law.

1.19.   "<u>Chapter 11 Cases</u>" means the cases commenced by the Debtors on December 27, 2020 under subchapter V of chapter 11 of the Bankruptcy Code, jointly administered under case number 20-_____ (___).

1.20.   "<u>Claim</u>" means: (a) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or (b) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

1.21. "<u>Claims Reconciliation Process</u>" means the process to reconcile all Claims asserted against the Debtors with the Debtors' books and records, including any objections to Claims filed by the Debtors, which the Debtors will commence immediately after the Bar Date.

1.22. "<u>Class</u>" means a category of Claims or Interests described in Article II hereof.

1.23. "<u>Collateral</u>" means any property or interest in property of the Estates subject to an unavoidable Lien to secure the payment or performance of a Claim.

1.24. "<u>Confirmation</u>" means the Bankruptcy Court's confirmation of the Plan in accordance with section 1129 of the Bankruptcy Code.

1.25. "<u>Confirmation Date</u>" means the date on which the clerk of the Bankruptcy Court enters the Confirmation Order on the docket corresponding to the Chapter 11 Cases.

1.26. "<u>Confirmation Hearing</u>" means the hearing held by the Bankruptcy Court, as it may be continued from time to time, to consider Confirmation.

1.27. "<u>Confirmation Order</u>" means the order of the Bankruptcy Court confirming this Plan, or any amendment thereto, pursuant to section 1129 of the Bankruptcy Code, and any findings of fact and conclusions of law contained in the Confirmation Order or a separate document entered substantially contemporaneously therewith, which Confirmation Order shall approve the Sale and must be acceptable to the Debtors and Buyer.

1.28. "<u>Creditor</u>" means any Person who: (a) holds a Claim against the Debtors that arose prior to the Petition Date; (b) holds a Claim against the Debtors, which arose after the Petition Date, other than an Administrative Claim of the type specified in Bankruptcy Code section 503(b); or (c) holds a Claim against the Debtors of the kind specified in Bankruptcy Code sections 502(g), 502(h) or 502(i).

1.29. "<u>Cure Amounts</u>" means any amount the Debtors believe is required to be paid pursuant to section 365(b) of the Bankruptcy Code to cure any defaults under the Assigned Contracts listed on the Assumption Schedule.

1.30. "<u>DIP Credit Agreement</u>" means the Senior Secured, Superpriority Debtor-In-Possession Credit Agreement, dated as of December [●], 2020, by and between Buyer, Savari, and the Guarantors.

1.31. "<u>DIP Order</u>" means, collectively, the interim and final orders entered by the Bankruptcy Court authorizing the Debtors to enter into the DIP Credit Agreement and incur postpetition obligations thereunder, as such orders may be amended, supplemented, or modified from time to time.

1.32. "<u>Disallowed</u>" means, when referring to a Claim or Interest, a Claim (including a claim listed by the Debtors in their Schedules) or Interest, or any portion of a Claim or Interest, which has been disallowed or expunged by a Final Order.

1.33.   "<u>Disputed Claim</u>" means a Claim that is not an Allowed Claim nor a disallowed Claim, and is any Claim, proof of which was filed, or an Administrative Claim or other unclassified Claim, which is the subject of a dispute under the Plan or as to which Claim the Debtors or the Trustee, as applicable, has interposed a timely objection and/or a request for estimation in accordance with section 502(c) of the Bankruptcy Code and Bankruptcy Rule 3018 or other applicable law, which dispute, objection, and/or request for estimation has not been withdrawn or determined by a Final Order, and any Claim, proof of which was required to be filed by order of the Bankruptcy Court, but as to which a proof of claim was not timely or properly filed (or deemed timely or properly filed).

1.34.   "<u>Disputed Claims Reserve</u>" means an appropriate reserve to be established and administered by the Trustee.

1.35.   "<u>Distribution</u>" means any distribution made pursuant to the terms of this Plan.

1.36.   "<u>Distribution Address</u>" means the address set forth in the applicable proof of claim, as such address may have been updated pursuant to Bankruptcy Rule 2002(g).  If no proof of claim is or has been filed with respect to a particular Claim, "Distribution Address" means the address set forth in the Debtors' Schedules, as such address may have been updated pursuant to Bankruptcy Rule 2002(g).

1.37.   "<u>Distribution Date</u>" means any date on which a Distribution is made to holders of Allowed Claims under this Plan, or as otherwise agreed.  The first Distribution shall occur on or as soon as practicable after the Effective Date or as otherwise agreed by the Trustee.  Subsequent Distributions shall occur as soon after the first Distribution Date as the Trustee shall determine, but with such final Distribution Date occurring approximately one year and one month after the Effective Date.

1.38.   "<u>Effective Date</u>" means the Date on which this Plan shall take effect, which date shall be a Business Day on or after the Confirmation Date on which all conditions precedent to the effectiveness of the Plan specified in Article IX, have been satisfied, or, if capable of being waived, waived, which date shall be specified in a notice filed by the Debtors.

1.39.   "<u>Encumbrances</u>" means, collectively, any and all security interests, Liens, pledges, Claims, levies, charges, escrows, encumbrances, options, rights of first refusal, transfer restrictions, conditional sale contracts, title retention contracts, mortgages, hypothecations, indentures, security agreements or other agreements, arrangements, contracts, commitments, understandings or obligations of any kind whatsoever, whether written or oral.

1.40.   "<u>Estates</u>" means the Debtors' estates created pursuant to section 541 of the Bankruptcy Code upon the Petition Date.

1.41.   "<u>Excluded Assets</u>" means the Assets of the Debtors excluded from the Sale, with the meaning ascribed to such term in the Asset Purchase Agreement.

1.42.   "<u>Exculpated Parties</u>" means each of the following in its capacity as such, and only in its capacity as such: (a) the Debtors' Professionals, advisors, attorneys, Representatives, officers, trustees, employees (acting in such capacity), and directors; (b) the Trustee; and

(c) Buyer, its Affiliates, and its and their respective professionals, advisors, attorneys, representatives, directors, managers, officers, employees, managers, principals, members, agents, consultants, equity holders (regardless whether such interests are held directly or indirectly), predecessors, participants, successors, and assigns.

1.43. "Fee Claim Deadline" means the deadline for all Professionals or other Persons to file an application for final allowance of compensation and reimbursement of Professional Fee Claims for services rendered before the Effective Date, which deadline shall be the date which is thirty (30) days after the Effective Date.

1.44. "Fee Application" means the final fee application and/or an application for payment of reasonable fees and expenses filed under section 503(b) of the Bankruptcy Code by any parties seeking payment of Professional Fee Claims and/or reimbursement of expenses, as applicable, which shall be filed in accordance with Section 4.2(c)(ii) hereof.

1.45. "Final Order" means an order or judgment of the Bankruptcy Court or other court of competent jurisdiction as to which the time to appeal, petition for certiorari, or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari or other proceedings for reargument or rehearing shall then be pending; *provided, however*, if an appeal, or writ of certiorari, reargument or rehearing thereof has been filed or sought, such order of the Bankruptcy Court or other court of competent jurisdiction shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied or reargument or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or move for reargument or rehearing shall have expired; provided, further, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed with respect to such order shall not cause such order not to be a Final Order.

1.46. "General Unsecured Claim" means a Claim that is not an Administrative Claim, a Professional Fee Claim, a Priority Tax Claim, a Superpriority DIP Claim, or a Secured Claim.

1.47. "Guarantors" means VTES and SSPL.

1.48. "Impaired" means any Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

1.49. "Interest" means the rights and interests as of the Petition Date of any Person in the Debtors.

1.50. "Lien" means any charge against, security interest in, Encumbrance upon, or other interest in property to secure payment of a debt or performance of an obligation

1.51. "Person" means any individual, corporation, partnership, association, joint venture, limited liability company, limited liability partnership, estate, trust, unincorporated organization or governmental unit or subdivision thereof or other entity.

1.52. "Petition Date" means December 27, 2020, the date the Debtors filed their voluntary petitions for relief under subchapter V of chapter 11 of the Bankruptcy Code.

1.53.  "<u>Plan</u>" means this chapter 11 plan and any exhibits annexed hereto and any documents delivered in connection herewith, as the same may be amended or modified from time to time by any duly authorized amendment or modification pursuant to section 1190, 1191 and 1129 of the Bankruptcy Code and the Bankruptcy Rules.

1.54.  "<u>Plan Proponent</u>" means the Debtors.

1.55.  "<u>Plan Supplement</u>" means any documents, agreements, schedules, and exhibits, specified in this Plan, to be filed with the Bankruptcy Court no later than seven (7) days prior to the Voting Deadline, provided that the Debtors may amend such Plan Supplement at any time prior to the Confirmation Hearing.

1.56.  "<u>Priority Claims</u>" means all Priority Non-Tax Claims and Priority Tax Claims.

1.57.  "<u>Priority Non-Tax Claim</u>" means a Claim or a portion of a Claim, which is entitled to priority under section 507(a) of the Bankruptcy Code, other than Administrative Claims and Priority Tax Claims.

1.58.  "<u>Priority Tax Claim</u>" means a Claim or a portion of a Claim, which is entitled to priority under sections 502(i) or 507(a)(8) of the Bankruptcy Code.

1.59.  "<u>Pro Rata</u>" means, at any time, the proportion that an Allowed Claim bears to the aggregate amount of all Claims in a particular Class at such time, including Disputed Claims at such time (a) as calculated by the Trustee on or before any Distribution Date; or (b) as determined or estimated by the Bankruptcy Court.

1.60.  "<u>Professionals</u>" means an entity (a) employed pursuant to a Bankruptcy Court order in accordance with sections 327 and 363 of the Bankruptcy Code and to be compensated for services rendered before or on the Effective Date, pursuant to sections 327, 328, 329, 330, 331, and 363 of the Bankruptcy Code or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

1.61.  "<u>Professional Fee Claims</u>" means any Claim of (a) a Professional, retained in the Chapter 11 Cases, pursuant to sections 327 and 363 of the Bankruptcy Code for compensation or reimbursement of costs and expenses relating to services incurred after the Petition Date, but prior to and including the Effective Date, when and to the extent any such Claim is Allowed by the Bankruptcy Court pursuant to sections 329, 330, 331, and 503(b) of the Bankruptcy Code, or (b) a Person seeking compensation and reimbursement pursuant to section 503(b)(4) of the Bankruptcy Code.

1.62.  "<u>Released Party</u>" means each of the following in their capacity as such, and only in their capacity as such: (a) the Debtors' officers, directors, Professionals, advisors, attorneys, and Representatives; (b) the Trustee; and (c) the Buyer, its Affiliates, and its and their respective professionals, advisors, attorneys, representatives, directors, managers, officers, employees, managers, principals, members, agents, consultants, equity holders (regardless whether such interests are held directly or indirectly), predecessors, participants, successors, and assigns.

1.63.  "<u>Representative</u>" means any person who is authorized to act on behalf of another.

1.64.    "Sale" means the transaction between the Debtors and Buyer pursuant to which the Debtors are selling the Acquired Assets to the Buyer free and clear of all Liens, Claims, Interests and Encumbrances pursuant to section 1123(a)(5) of the Bankruptcy Code, as set forth in the Confirmation Order and Asset Purchase Agreement.

1.65.    "Sale Proceeds" means the cash proceeds deriving from the Asset Purchase Agreement.

1.66.    "Sale Transaction" means, collectively, the various transactions contemplated under the Asset Purchase Agreement to effectuate the Sale.

1.67.    "Schedules" means the Schedules of Assets and Liabilities and Statement of Financial Affairs for the Debtors to be filed by the Debtors with the Bankruptcy Court on or before January 4, 2021 pursuant to Bankruptcy Rule 1007, and any amendments thereto.

1.68.    "Secured Claim" means a Claim secured by a Lien on any Asset of the Debtors, or right of setoff, which Lien or right of setoff, as the case may be, is valid, perfected, and enforceable under applicable law and is not subject to avoidance under the Bankruptcy Code or applicable non bankruptcy law, but only to the extent of the value, pursuant to section 506(a) of the Bankruptcy Code, of any interest of the holder of the Claim in property of the Estates securing such Claim.

1.69.    "Secured Creditor" means Silicon Valley Bank.

1.70.    "Superpriority DIP Claim" means all Claims of Buyer arising under, derived from, secured by, or based on the DIP Credit Agreement or the DIP Order, including claims for all principal amounts outstanding, interest, fees, expenses, costs, and other charges arising under or related to the DIP Credit Agreement.

1.71.    "Trustee" means the trustee appointed under subchapter V of title 11 of the Bankruptcy Code by the United States Trustee for Region 2.

1.72.    "U.S. Trustee" means the United States Trustee for Region 2.

1.73.    "Unclassified Claims" means Administrative Claims and Priority Tax Claims

1.74.    "Voting Deadline" means [_____, 2021 at 5:00 p.m. (Eastern)], the deadline established for holders of Claims to deliver a ballot to accept or reject this Plan relating to the solicitation of votes with respect to this Plan.

**Section 1.2    Rules of Interpretation and Time Periods.**

Unless otherwise specified, all section, article, and exhibit references in the Plan are to the respective section in, article of, or exhibit to, the Plan, as the same may be amended, waived, or modified from time to time. Words denoting the singular number shall include the plural number and vice versa, as appropriate, and words denoting one gender shall include the other gender.

In computing any period of time prescribed or allowed by the Plan, unless otherwise set forth herein or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

### Section 1.3     Application of Definitions and Rules of Construction Contained in the Bankruptcy Code.

Words and terms defined in section 101 of the Bankruptcy Code shall have the same meanings when used in the Plan, unless a different definition is given in the Plan.  The rules of construction contained in section 102 of the Bankruptcy Code shall apply to the construction of the Plan.

### Section 1.4     Other Terms.

The words "herein," "hereof," "hereto," "hereunder," and others of similar import refer to the Plan as a whole and not to any particular section, subsection, or clause contained in the Plan.

## ARTICLE II.

## CLASSIFICATION OF CLAIMS AND INTERESTS

### Section 2.1     Classification and Treatment Generally

Pursuant to sections 1122, 1123 and 1190 of the Bankruptcy Code, set forth below is a designation of Classes of Claims and Interests which are placed in a particular Class for  all purposes under the Plan, as set forth herein.

### Section 2.2     Unclassified Claims - Administrative Claims and Priority Tax Claims.

As provided by section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims shall not be classified under the Plan, and shall instead be treated separately as Unclassified Claims on the terms set forth in Article IV of the Plan.

### Section 2.3     Criterion of Class.

A Claim is in a particular Class only to the extent that the Claim qualifies within the description of that Class and is in a different Class to the extent that the remainder of the Claim qualifies within the description of the different Class.

**Section 2.4     Debtors Claims and Interests.**

The Classes of Claims against and Interests in the Debtors shall be:

    (a)    **Class 1 – Superpriority DIP Claims.**

The Class 1 Claims shall consist of the Superpriority DIP Claims against the Debtors.

    (b)    **Class 2 – Secured Claims.**

The Class 2 Claims shall consist of the Secured Claims against the Debtors

    (c)    **Class 3 – Priority Non-Tax Claims.**

The Class 3 Claims shall consist of the Priority Non-Tax Claims against the Debtors.

    (d)    **Class 4 – General Unsecured Claims.**

The Class 4 Claims shall consist of the General Unsecured Claims against the Debtors.

    (e)    **Class 5 – Interests.**

The Class 5 Interests shall consist of all Interests in the Debtors.

## ARTICLE III.

## IDENTIFICATION OF IMPAIRED CLAIMS AND INTERESTS UNDER THE PLAN

**Section 3.1     Impaired Classes of Claims.**

Class 4 Claims and Class 5 Interests are Impaired under the Plan.

**Section 3.2     Impairment Controversies.**

If a controversy arises as to whether any Claim or Interest, or any Class of Claims or Interests, is Impaired under the Plan, the Bankruptcy Court shall, after notice and a hearing, determine such controversy.

# ARTICLE IV.

## SUBCHAPTER V PLAN CONFIRMATION REQUIREMENTS

Subchapter V of chapter 11 of the Bankruptcy Code requires that the Debtors provide its creditors with sufficient information to analyze the Plan in order to make an informed decision regarding their vote on the Plan.

Pursuant to sections 1129, 1190 and 1191 of the Bankruptcy Code, the Bankruptcy Court must find that:

- the Plan satisfied the "***best interest of creditors test***" – requiring that creditors receive more under the Plan they would if the Debtors were liquidated under chapter 7 of the Bankruptcy Code;

- the Plan is "***fair and equitable***" – requiring that the Plan must provide distributions to creditors greater than the liquidation value of the Debtors' Estates and no less than the projected "Disposable Income" of the Debtors, as defined in section 1191(d) of the Bankruptcy Code over a certain commitment period; and

- the Debtors will be, or are reasonably likely to be, able to make the payments promised under the Plan – or that the Plan is feasible.

To satisfy these requirements, the Plan provides a balance sheet analysis, projections, valuations and a liquidation analysis.

## Section 4.1     Best Interest of Creditors - Liquidation Analysis.

Pursuant to section 1129(a)(7) of the Bankruptcy Code, for this Plan to be confirmed, each creditor must either have voted to accept the Plan (or be deemed to have accepted this Plan), or this Plan must provide for each creditor to receive at least as much as it would as of the Effective Date if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on such date. A detailed liquidation analysis prepared by the Debtors with the assistance of their advisors is set forth in **Exhibit 1** to this Plan. The liquidation analysis provides a listing and analysis of all of the Debtors' assets and liabilities. The Debtors and their advisors have concluded that a liquidation of the Debtors' assets would result in [$_____]available for the satisfaction of the Claims of all Impaired creditors whose Claims are estimated to equal [$_____,] which would result in an [___%] distribution to unsecured creditors.

## Section 4.2     The Plan is Fair and Equitable

Pursuant to section 1191(c) of subchapter V of the Bankruptcy Code, the Debtors' plan must provide a payout to creditors of all of the Debtors' disposable income over a 3 to 5 year commitment period ("Disposable Income"). Based upon the analysis prepared by the Debtors with the assistance of their advisors, the Debtors' projected Disposable Income post Effective Date over a 3, 4, or 5 period is negative and therefore, less than Liquidation Value. This analysis is contained at **Exhibit 2** to this Plan. For the Plan to be confirmed, the Debtors must provide

creditors with a distribution that is more than the Liquidation Value. Sections 1191(c)(2)(A) and (B) of the Bankruptcy Code allow the Debtors to make distributions over a period of between 3 to 5 years under a plan. Section 1191(c)(2)(A) also authorizes a debtor to make a lump sum payment that is equal to the present value of what would be the multi-year distribution.

The Plan provides for distributions to creditors greater than the Liquidation Value by making a lump sum distribution at the conclusion of the Claims Reconciliation Process. The Plan provides a distribution to creditors that is a multiple of the Liquidation Value. The amount of this multiple will be dependent upon whether the Plan is confirmed consensually or non-consensually.

Under the Bankruptcy Code, the Debtors can confirm the Plan in one of two ways: (i) on a consensual basis under sections 1191(a) and 1129(a) of the Bankruptcy Code—this requires that the unsecured creditors in Class 3 vote in favor of the Plan by at least 2/3 in dollar amount and more than 1/2 in number of the Allowed Claims in the Class; or (ii) on a non-consensual basis under section 1191(b) of the Bankruptcy Code—under this section the Plan would be confirmed under the "cram down" provisions of the Bankruptcy Code. In either case, the Debtors are able to satisfy the requirement of section 1129(a)(7) of the Bankruptcy Code because holders of Allowed General Unsecured Claims who comprise the only Impaired Class of creditors, will receive an amount materially greater than the amount these creditors would be expected to receive in a hypothetical Chapter 7 liquidation.

**Section 4.3**     **Plan Feasibility.**

Sections 1191(c)(3)(A)(i) and (ii) of the Bankruptcy Code require that the Debtors "be able to make all payments under the plan; or that there is a reasonable likelihood that the debtor will be able to make all payments under the plan." The Plan satisfies these requirements. As discussed herein, the Debtors intend to fund the distributions under the Plan utilizing the Sale Proceeds, including any Accounts Receivable Payments that may be made within one year and one month after the closing of the Sale. Under the Plan, sufficient funds exist to pay (i) all Allowed Priority and Administrative Claims and Secured Claims in full as required by the Bankruptcy Code on or shortly after the Effective Date and (ii) all other distributions provided under this Plan approximately one year and one month after the Effective Date in a single payment.

SUBJECT TO CERTAIN RESTRICTIONS AND REQUIREMENTS SET FORTH IN SECTION 1193 OF THE BANKRUPTCY CODE, FEDERAL RULE OF BANKRUPTCY PROCEDURE 3019 AND THIS PLAN, THE DEBTORS RESERVE THE RIGHT TO ALTER, AMEND, MODIFY, REVOKE, OR WITHDRAW THIS PLAN PRIOR TO ITS EFFECTIVE DATE.

# ARTICLE V.

## PROVISIONS FOR TREATMENT OF UNCLASSIFIED
## CLAIMS UNDER THE PLAN

**Section 5.1**    **Unclassified Claims.**

As set forth below, the Administrative Claims and Priority Tax Claims shall be treated in accordance with sections 1129(a)(9)(A) and 1129(a)(9)(C) of the Bankruptcy Code, respectively.

**Section 5.2**    **Treatment of Administrative Claims.**

(a)    <u>Allowance of Administrative Claims</u>. An Administrative Claim is defined in the Plan and means any Claim under sections 503(b) and 507(a)(2) of the Bankruptcy Code including, without limitation, (a) the actual and necessary postpetition costs and expenses incurred by the Debtors in preserving the Estates or operating their business, (b) Allowed Claims pursuant to section 503(b)(9) of the Bankruptcy Code, and (c) any Allowed Claims that are entitled to be treated as Administrative Claims pursuant to a final order of the Bankruptcy Court.

(b)    <u>Payment of Allowed Administrative Claims</u>. Subject to the Bar Date and other provisions in the Plan and except to the extent the Debtors and the holder of an Allowed Administrative Claim agree to different and less favorable treatment, the Trustee shall pay, in full satisfaction and release of such Claim, to each holder of an Allowed Administrative Claim, Cash, in an amount equal to such Allowed Administrative Claim, on the later of (i) the Effective Date and (ii) the first Business Day after the date that is thirty (30) calendar days after the date on which such Administrative Claim becomes an Allowed Administrative Claim, or as soon thereafter as is practicable.

(c)    <u>Administrative Bar Date</u>.

(i)    <u>General Provisions</u>. Except as provided below for Professionals requesting compensation or reimbursement for Professional Fee Claims, requests for payment of Administrative Claims must be filed no later than thirty (30) days after notice of entry of the Confirmation Order is filed with the Bankruptcy Court or such later date as may be established by order of the Bankruptcy Court. Holders of Administrative Claims who are required to file a request for payment of such Claims and who do not file such requests by the Administrative Claims Bar Date, shall be forever barred from asserting such Claims against the Debtors or their respective property, and the holder thereof shall be enjoined from commencing or continuing any action, employment of process, or act to collect, offset, or recover such Administrative Claim.

(ii)    <u>Professionals</u>. All Professionals or other Persons requesting compensation or reimbursement of Professional Fee Claims for services rendered before the Effective Date (including compensation requested by any Professional or other entity for making a substantial

contribution in the Chapter 11 Cases) shall file an application for final allowance of compensation and reimbursement of expenses no later than the Fee Claim Deadline. Objections to applications of Professionals or other entities for compensation or reimbursement of expenses must be filed no later than twenty-one (21) days after any such application is filed. All compensation and reimbursement of expenses allowed by the Bankruptcy Court shall be paid by the Trustee to the applicable Professional or other entities requesting compensation or reimbursement of Professional Fee Claims as soon as is practicable after any such Professional Fee Claims are Allowed. Each Professional or other Person that intends to seek payment on account of a Professional Fee Claim shall provide the Debtors with a statement, by no later than three (3) days after entry of the Confirmation Order, of the amount of estimated unpaid fees and expenses accrued by such Professional up to the date of such statement, the amount of fees and expenses that each such Professional expects to incur from such date through the Effective Date, and the amount of fees and expenses that each such Professional expects to incur from such date in connection with the preparation and prosecution of each such Professional's Fee Application. For the avoidance of doubt, the estimate included in such statement shall not be a cap and any amount that exceeds the estimate shall still be treated as a Professional Fee Claim payable to such Professional.

**Section 5.3    Treatment of Priority Tax Claims.**

Subject to the Bar Date and other provisions in the Plan and except to the extent the Debtors and the holder of an Allowed Priority Tax Claim agree to different and less favorable treatment, the Trustee shall pay, in full satisfaction and release of such Claim, to each holder of an Allowed Priority Tax Claim, Cash, in an amount equal to such Allowed Priority Tax Claim, on the later of (i) the Effective Date and (ii) the first Business Day after the date that is thirty (30) calendar days after the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, or as soon thereafter as is practicable. Allowed Priority Tax Claims shall be paid in Cash.

### PROVISIONS FOR TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS UNDER THE PLAN

**Section 5.4    Treatment of Classified Claims and Interests.**

The Classes of Claims against and Interests in the Debtors shall be treated under the Plan as follows:

(a)    **Class 1 – Superpriority DIP Claims.**

Superpriority DIP Claims consist of any Claim of Buyer arising under, derived from, secured by, or based on the DIP Credit Agreement or the DIP Order, including claims for all principal amounts outstanding, interest, fees, expenses, costs, and other charges arising under or

related to the DIP Credit Agreement. All such Superpriority DIP Claims of Buyer shall be Allowed Claims. Holders of Allowed Claims in Class 1 are unimpaired under the Plan. Each holder of an Allowed Superpriority DIP Claim is deemed to have conclusively presumed to accept the Plan under section 1126(f) of the Bankruptcy Code and is therefore not entitled to vote to accept or reject the Plan in its capacity as a holder of such Claim.

All Allowed Superpriority DIP Claims of Buyer shall be extinguished at the closing of the Sale.

(b)     **Class 2 – Secured Claims.**

Secured Claims consist of any Claim secured by a Lien on any Asset of the Debtors, or right of setoff, which Lien or right of setoff, as the case may be, is valid, perfected and enforceable under applicable law and is not subject to avoidance under the Bankruptcy Code or applicable non-bankruptcy law, but only to the extent of the value, pursuant to section 506(a) of the Bankruptcy Code, of any interest of the holder of the Claim in property of the Estates securing such Claim. Holders of Allowed Claims in Class 2 are unimpaired under the Plan. Each holder of an Allowed Secured Claim is deemed to have conclusively presumed to accept the Plan under section 1126(f) of the Bankruptcy Code and is therefore not entitled to vote to accept or reject the Plan in its capacity as a holder of such Claim.

Provided that the holder of a Class  Claim has not yet been paid, on the later of (i) the Effective Date and (ii) for Claims in Class 2 that were Disputed Claims on the Effective Date and have thereafter become Allowed Secured Claims, immediately following the date upon which such Claims became Allowed Secured Claims, or as soon thereafter as is practicable, holders of each such Allowed Secured Claim shall receive (a) Cash in an amount not to exceed the amount of such Allowed Secured Claim or (b) such other treatment as may be agreed upon by the Trustee and the holder of such Allowed Secured Claim, or as may otherwise be provided in the Bankruptcy Code, provided that the holder of such Allowed Secured Claim will not receive more than the value of the Collateral securing such Claim.

(c)     **Class 3 -  Priority Non-Tax Claims**

 Priority Non-Tax Claims consist of any Claim afforded priority under section 507(a) of the Bankruptcy Code that is not an Administrative Claim or Priority Tax Claim. Each holder of an Allowed Priority Non-Tax Claim is deemed to have conclusively presumed to accept the Plan under section 1126(f) of the Bankruptcy Code and is therefore not entitled to vote to accept or reject the Plan in its capacity as a holder of such Claim.

Provided that the holder of a Class 3 Claim has not yet been paid, on the later of (i) the Effective Date and (ii) for Claims in Class 3 that were Disputed Claims on the Effective Date and have thereafter become Allowed Priority Non-Tax Claims, immediately following the date upon which such Claims became Allowed Priority Non-Tax Claims, or as soon thereafter as is practicable, holders of each such Allowed Priority Non-Tax Claims shall receive (a) Cash in an amount not to exceed the amount of such Allowed Priority Non-Tax Claim or (b) such other treatment as may be agreed upon by the Trustee and the holder of such Allowed Priority Non-Tax Claim, or as may otherwise be provided in the Bankruptcy Code.

(d)  **Class 4 - General Unsecured Claims.**

General Unsecured Claims consist of any Claim that is not a Non-Tax Priority Claim, an Administrative Claim, a Professional Fee Claim, a Priority Tax Claim, a Superpriority DIP Claim, or a Secured Claim. Holders of Claims in Class 4 are Impaired. Each holder of General Unsecured Claim is not conclusively presumed to accept the Plan under section 1126(f) of the Bankruptcy Code and is therefore entitled to vote to accept or reject the Plan in its capacity as a holder of such Claim.

Provided that the holder of a Class 4 Claim has not yet been paid, on the later of (i) the Effective Date and (ii) for Claims in Class 4 that were Disputed Claims on the Effective Date and have thereafter become Allowed General Unsecured Claims, immediately following the Distribution Date subsequent to the date upon which such Claims became Allowed General Unsecured Claims, or as soon thereafter as is practicable, holders of each such Allowed General Unsecured Claim shall receive (a) a pro rata share of Cash in an amount not to exceed the amount of such Allowed General Unsecured Claim, (b) a pro rata share of any Accounts Receivable Payments received within one year and one month after the closing of the Sale, or (c) such other treatment as may be agreed upon by the Trustee and the holder of such Allowed General Unsecured Claim. Final Distributions to holders of Class 4 Claims are expected to occur approximately one year and one month after the Effective Date in a single payment.

(e)  **Class 5 – Interests.**

Class 5 Interests are Impaired. The holders of Class 5 Interests will receive no Distribution. On the Effective Date, all Class 5 Interests will be deemed canceled, null and void and of no force and effect. The holders of Class 5 Interests are deemed to reject the Plan and are not entitled to vote to accept or reject the Plan.

## Section 5.5    Reservation of Rights Regarding Claims.

Except as otherwise explicitly provided in the Plan, nothing shall affect, as applicable, the Debtors or the Trustee's rights, defenses, and counterclaims, both legal and equitable, with respect to any Claims, including, but not limited to, all rights of setoff or recoupment.

[***Remainder of Page Intentionally Left Blank***]

## ARTICLE VI.

## ACCEPTANCE OR REJECTION OF THE PLAN; EFFECT OF REJECTION BY ONE OR MORE CLASSES OF CLAIMS OR INTERESTS

**Section 6.1     Classes Entitled to Vote.**

Except for Class 1 (Superiority DIP Claims), Class 2 (Secured Claims), Class 3 (Non-Tax Priority Claims), and Class 5 (Interests), all other Classes of Claims are entitled to vote on the Plan.

**Section 6.2     Class Acceptance Requirement.**

A Class of Claims shall have accepted the Plan if it is accepted by at least two-thirds (2/3) in amount and more than one-half (1/2) in number of the Allowed Claims in such Class that have voted on the Plan.

## ARTICLE VII.

## IMPLEMENTATION OF THE PLAN

**Section 7.1     Sale.**

Upon the Effective Date, the Debtors shall effectuate the Sale Transactions contemplated pursuant to the Asset Purchase Agreement and, among other things, the Acquired Assets shall be sold and transferred to and vest in Buyer free and clear of all Liens, Claims, Interests and Encumbrances pursuant to sections 363(f) and 1141(c) of the Bankruptcy Code and in accordance with the terms of the Confirmation Order, the Plan, and the Asset Purchase Agreement, each as applicable.  On and after the Effective Date, Buyer may operate its businesses and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

**Section 7.2     Plan Funding Mechanism.**

The Plan shall be funded from the Sale Proceeds (including any Accounts Receivable Payments) and any other Assets of the Estates excluded from the Sale, except as expressly set forth herein.

**Section 7.3     Establishment of Reserves.**

At least three (3) days prior to the Confirmation Hearing, the Debtors shall file with the Bankruptcy Court a notice that reflects the proposed amounts of the Disputed Claims Reserve.

**Section 7.4**     **Corporate Action.**

The Plan will be administered by the Trustee and all actions taken under the Plan in the name of the Debtors shall be taken through the Trustee in accordance with the provisions of the Plan. Upon the Distribution of all Assets pursuant to the Plan and the filing by the Trustee of a certification to that effect with the Bankruptcy Court (which may be included in the application for the entry of the final decree), the Debtors shall be deemed dissolved for all purposes without the necessity for any other or further actions to be taken by or on behalf of the Debtors or payments to be made in connection therewith; *provided, however*, that the Debtors may, but will not be required to, take appropriate action to dissolve under applicable law.

**Section 7.5**     **Closing of the Chapter 11 Cases.**

After all Disputed Claims filed against the Debtors have become Allowed Claims or have been Disallowed, and all Assets have been liquidated and converted into Cash (other than those Assets that have been or may be abandoned), and such Cash has been distributed in accordance with the Plan, or at such earlier time as the Trustee deems appropriate, the Trustee shall seek authority from the Bankruptcy Court to close the Chapter 11 Cases in accordance with the Bankruptcy Code and the Bankruptcy Rules.

**Section 7.6**     **Winding Down of Affairs.**

Following the Effective Date, the Debtors shall not engage in any business or take any actions, except those necessary to consummate the Plan and wind down their affairs. On and after the Effective Date, the Trustee may, in the name of the Debtors, take such actions without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, other than the restrictions imposed by the Plan or the Confirmation Order.

**Section 7.7**     **Powers and Duties of the Trustee.**

As of the Effective Date, the Trustee shall have all powers vested to it pursuant to section 1183(b) of the Bankruptcy Code.

**Section 7.8**     **Appointment of the Trustee.**

Pursuant to section 1183(a) of the Bankruptcy Code, the Trustee has been appointed in the Chapter 11 Cases. The Trustee shall be deemed the Estates' sole representative in accordance with section 1123 of the Bankruptcy Code and shall have all powers, authority, and responsibilities specified under the Bankruptcy Code pursuant to section 1183(b) and under the Plan for a trustee appointed under subchapter V of chapter 11 of the Bankruptcy Code.

**Section 7.9**     **Distributions to Holders of Claims and Interests.**

        (a)     Estimation of Claims.

The Debtors or the Trustee, as applicable, may, at any time, request that the Bankruptcy Court estimate any Claim not expressly Allowed by the terms of the Plan and otherwise subject

to estimation under section 502(c) of the Bankruptcy Code and for which the Debtors may be liable under the Plan, including any Claim for taxes, to the extent permitted by section 502(c) of the Bankruptcy Code, regardless of whether any party in interest previously objected to such Claim, and the Bankruptcy Court will retain jurisdiction to estimate any Claim pursuant to section 502(c) of the Bankruptcy Code at any time prior to the time that such Claim becomes an Allowed Claim. If the Bankruptcy Court estimates any contingent or unliquidated Claim, the estimated amount will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. The foregoing objection, estimation, and resolution procedures are cumulative and not necessarily exclusive of one another. Claims may be estimated by the Bankruptcy Court and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

(b)     No Recourse.

Notwithstanding that the Allowed amount of any particular Disputed Claim is reconsidered under the applicable provisions of the Bankruptcy Code and Bankruptcy Rules or is Allowed in an amount for which after application of the payment priorities established by the Plan there is insufficient value to provide a recovery equal to that received by other holders of Allowed Claims in the respective Class, no Claim holder shall have recourse against the Debtors, the Estates, the Trustee, or any of their respective professionals, consultants, officers, directors, or members or their successors or assigns, or any of their respective property. Except as specifically stated otherwise in the Plan, nothing in the Plan shall modify any right of a holder of a Claim under section 502(j) of the Bankruptcy Code.

**THE ESTIMATION OF CLAIMS AND ESTABLISHMENT OF RESERVES UNDER THE PLAN MAY LIMIT THE DISTRIBUTION TO BE MADE ON INDIVIDUAL DISPUTED CLAIMS IF THE ESTIMATION IS MADE SOLELY FOR THE PURPOSE OF ESTIMATING A MAXIMUM LIABILITY FOR RESERVE PURPOSES, REGARDLESS OF THE AMOUNT FINALLY ALLOWED ON ACCOUNT OF SUCH DISPUTED CLAIMS.**

(c)     Automatic Disallowance and Expungement of Certain Claims. On the Effective Date, all Claims filed after the applicable Bar Date that were required to be filed in advance of such Bar Date and under the terms of the order relating thereto, shall be expunged and disallowed without any further notice to or action, order, or approval of the Bankruptcy Court.

(d)     Distribution on Account of Allowed Claims.

Following the Effective Date and in accordance the Plan, Distributions shall be made as follows:

On the Effective Date, or as soon as practicable thereafter, the Trustee shall establish: the Disputed Claims Reserve with Cash in an amount to be determined by the Trustee.

On the Effective Date, or as soon as practicable thereafter, the Cash shall be distributed to holders of certain Allowed Administrative Claims by the Trustee. Except as expressly set forth in

the Plan, upon satisfaction of the Allowed Superpriority DIP Claim and the Allowed Secured Claim, the Trustee shall distribute Cash in an amount not to exceed the amount of each such unpaid (i) Allowed Administrative Claim plus interest and each Professional Fee Claim, until such Claims are satisfied in full; and Allowed Priority Tax Claim plus interest, until such Claims are satisfied in full.

(i) <u>Distributions on Account of Allowed Class 1 – Superpriority DIP Claims</u>. Allowed Superpriority DIP Claims of Buyer shall be extinguished upon the closing of the Sale.

(ii) <u>Distributions on Account of Allowed Class 2 – Secured Claims</u>. Provided that the holder of a Class 2 Claim has not yet been paid, on the later of (i) the Effective Date and (ii) for Claims in Class 2 that were Disputed Claims on the Effective Date and have thereafter become Allowed Secured Claims, immediately following the Distribution Date subsequent to the date upon which such Claims became Allowed Secured Claims, or as soon thereafter as is practicable, holders of each such Allowed Secured Claim shall receive (a) Cash from the Trustee in an amount not to exceed the amount of such Allowed Secured Claim, or (b) such other treatment as may be agreed upon by the Trustee and the holder of such Allowed Secured Claim, or as may otherwise be provided in the Bankruptcy Code, provided that the holder of such Allowed Secured Claim will not receive more than the value of the Collateral securing such Claim.

(iii) <u>Distribution on Account of Allowed Class 3 - Priority Non-Tax Claims</u>. Provided that the holder of a Class 3 Claim has not yet been paid, on the later of (i) the Effective Date and (ii) for Claims in Class 3 that were Disputed Claims on the Effective Date and have thereafter become Allowed Priority Non-Tax Claims, immediately following the Distribution Date subsequent to the date upon which such Claims became Allowed Priority Non-Tax Claims, or as soon thereafter as is practicable, the holder of such Allowed Priority Non-Tax Claim shall receive (a) Cash from the Trustee in an amount not to exceed the amount of such Priority Non-Tax Claim, or (b) such other treatment as may be agreed upon by the Trustee and the holder of such Allowed Non Priority Tax Claim, or as may otherwise be provided in the Bankruptcy Code,

(iv) <u>Distribution on Account of Allowed Class 4 - General Unsecured Claims</u>. Provided that the holder of a Class 4 Claim has not yet been paid, on the later of (i) the Effective Date and (ii) for Claims in Class 4 that were Disputed Claims on the Effective Date and have thereafter become Allowed General Unsecured Claims, immediately following the Distribution Date subsequent to the date upon which such Claims became Allowed General Unsecured Claims, or as soon thereafter as is practicable, the holder of such Allowed General Unsecured Claim shall receive (i) a pro rata share of Cash to be distributed under the

Plan and (ii) a pro rate share of any Accounts Receivable Payments received within one year and one month after the closing of the Sale.

(v)    <u>Distributions on Account of Class 5 – Interests</u>.  The holder of a Class 5 Interest will receive no Distribution under the Plan.

(e)    <u>Disputed Claims Reserve</u>.

(i)    <u>Objection to Claims</u>. Unless otherwise ordered by the Bankruptcy Court, on and after the Effective Date, the Trustee shall have the exclusive right to make, file, and prosecute objections to and settle, compromise, or otherwise resolve Disputed Claims, except that as to applications for allowances of Professional Fee Claims, objections may be made in accordance with the applicable Bankruptcy Rules by parties in interest.  Subject to further extension by the Bankruptcy Court, the Trustee shall file and serve a copy of any such objection upon the holder of the Claim to which an objection is made on or before the latest to occur of:  (i) 180 days after the Effective Date and (ii) such other date as may be fixed by the Bankruptcy Court either before or after the expiration of the 180 day time period. Notwithstanding any authority to the contrary, an objection to a Claim shall be deemed properly served on the claimant if made (a) in accordance with Federal Rule of Civil Procedure 4, as modified, and made applicable by Bankruptcy Rule 7004;  (b) by first-class mail, postage prepaid, on the signatory of the proof of claim or other representative identified in the proof of claim or any attachment thereto at the address of the Creditor set forth therein;  or (c) by first-class mail, postage prepaid, on any counsel that has appeared on the claimant's behalf in the Chapter 11 Cases.  From and after the Effective Date, the Trustee may settle or compromise any Disputed Claim or Cause of Action without further order of the Bankruptcy Court.

(ii)    <u>Resolution of Disputed Claims</u>. No Distribution or payment shall be made on account of a Disputed Claim until such Disputed Claim becomes an Allowed Claim.

(iii)    <u>Establishment of Disputed Claims Reserve</u>.  On the Effective Date, the Trustee shall establish and fund the Disputed Claims Reserve with Cash in an amount to be determined by the Trustee (or as otherwise required by order of the Bankruptcy Court). The Disputed Claims Reserve shall be administered by the Trustee.

(iv)    <u>Duties in Connection with Disputed Claims</u> The Trustee shall object to, settle, or otherwise resolve Disputed Claims, and shall make Distributions to holders of Disputed Claims that subsequently become Allowed Administrative Claims  or  Allowed  General  Unsecured

Claims, in accordance with the Plan from the Disputed Claims Reserve.

(v) <u>Distribution when a Disputed Claim is Resolved</u>. On the next Distribution Date following the date upon which a Disputed Claim is ultimately Allowed, the holder of such Claim shall receive from the Disputed Claims Reserve any amounts attributable to such Claim, in accordance with the Plan. Any Cash held in the Disputed Claims Reserve for the benefit of a holder of a Disputed Claim, which is subsequently disallowed, in whole or in part, shall become Available Cash for distribution in accordance with the provisions of the Plan.

(vi) <u>No Distributions from Litigation Recoveries to Defendants</u>. If a litigation recovery on account of a Cause of Action is obtained by the Trustee, such defendant shall not be entitled to share directly or indirectly in the proceeds from such litigation recovery, including, but not limited to, any recoveries pursuant to section 502(h) of the Bankruptcy Code.

**Section 7.10** **<u>Miscellaneous Distribution Provisions</u>.**

(a) <u>No Distribution in Excess of Allowed Amount of Claim</u>. Notwithstanding anything to the contrary herein or in the Plan, no holder of an Allowed Claim shall receive in respect of such Claim any Distribution in excess of the amount of such Allowed Claim plus interest as provided herein.

(b) <u>*De Minimis* Distributions</u>. The Trustee shall not be required to make any Cash payment of less than twenty-five dollars ($25.00).

(c) <u>Allocation of Payments</u>. Amounts paid to holders of Allowed Claims in satisfaction thereof shall be allocated first to the principal amounts of such Claims, with any excess allocated to interest, if any, that has accrued on such Claims but remains unpaid.

(d) <u>Timing of Distributions</u>. Each Distribution shall be made on the relevant Distribution Date therefore and shall be deemed to have been timely made if made on such date or within ten (10) days thereafter. No interest shall accrue or be paid with respect to any Distribution as a consequence of such Distribution not having been made on any date specified herein.

(e) <u>Manner of Payments Under the Plan</u>. Unless the Person or Entity receiving a Distribution agrees otherwise, any Distribution to be made in Cash under the Plan shall be made, at the election of the Trustee by check drawn on a domestic bank or by wire transfer from a domestic bank.

(f) <u>Setoffs</u>. The Trustee is authorized, pursuant to and to the extent permitted by applicable law, to set off against any Allowed Claim and the Distributions to be made on account of such Allowed Claim, the Claims, rights, and Causes of Action of any nature that the Estates may hold against the holder of such Allowed Claim; *provided*, that the Trustee gives the

holder of such Allowed Claim no fewer than five (5) days' notice in writing (including email) of the proposed setoff and the holder of such Allowed Claim does not object to the proposed setoff within thirty (30) days of receiving such notice. If an objection is timely raised to a proposed setoff, the Trustee may seek relief from the Bankruptcy Court to effectuate the setoff. Neither the failure to effect such a setoff nor the allowance of any Claim under the Plan shall constitute a waiver or release by the Estates or the Trustee of any such Claims, rights, and Causes of Action the Estates may have against such holder.

        (g)     <u>Exemption from Transfer Taxes</u>. Pursuant to section 1146(a) of the Bankruptcy Code, the assignment or transfer of any lease or sublease, the delivery, making, filing, or recording of any deed or other instrument of transfer, or the issuance, transfer, or exchange of any security, under the Plan, including any deeds, bills of sale, or assignments executed in connection with the Sale or any other disposition of Assets contemplated by the Plan, shall not be subject to any stamp, real estate transfer, mortgage, recording, or other similar tax to the maximum extent covered by section 1146 of the Bankruptcy Code.

        (h)     <u>Preservation and Application of Insurance</u>. The provisions of the Plan shall not diminish or impair in any manner the enforceability of coverage of any insurance policies (and any agreements, documents, or instruments relating thereto) that may cover Claims against the Debtors, any directors, trustees, or officers of the Debtors, or any other Person, including, without limitation, insurance for the Debtors' directors and officers.

        (i)     <u>Address for Delivery of Distributions</u>. Subject to Bankruptcy Rule 9010, any Distribution or delivery to a holder of an Allowed Claim shall be made at the address of such holder as set forth on the registers maintained by the Trustee as provided for in the Plan. If any Distribution is returned to the Trustee as undeliverable, no Distributions shall be made to such holder unless the Trustee is notified of such holder's then current address within sixty (60) days after such Distribution was returned. After such date, if such notice was not provided, a holder shall have forfeited its right to such Distribution, and the undeliverable Distribution shall be reallocated and distributed to holders of Allowed Claims in accordance with the Plan.

        (j)     <u>Federal Income Tax Consequences to the Debtors</u>. The Debtors do not anticipate that confirmation of the Plan will result in the Debtors being assessed or owing any Federal Income Tax. Confirmation will not trigger a taxable event. Moreover, the elimination of intercompany payables/receivables will not give rise to any cancellation of indebtedness income.

        (k)     <u>Time Bar to Cash Payments</u>.

Checks issued by the Trustee in respect of Allowed Claims shall be null and void if not negotiated within sixty (60) days after the date of issuance thereof. Requests for reissuance of any check shall be in writing to the Trustee by the holder of the Allowed Claim to whom such check originally was issued. Any such written claim in respect of such a voided check must be received by the Trustee on or before 60 days after the expiration of the 60-day period following the date of issuance of such check. Thereafter, the amount represented by such voided check shall irrevocably revert to the Estates and be treated as Available Cash. Any Claim in respect of such voided check shall be discharged and forever barred from assertion against the Debtors, the Estates or the Trustee.

(l)     Record Date for Distributions to Holders of Claims.  As of the close of business on the Confirmation Date, there shall be no further changes in the record holders of the Claims for purposes of the Distribution of Available Cash.  The Debtors or the Trustee, as applicable, shall have no obligation to recognize any transfer of Claims occurring after the Confirmation Date.

(m)     Disputed Payments.  If any dispute arises as to the identity of a holder of an Allowed Claim who is to receive any Distribution, the Trustee may, in lieu of making such Distribution to such Person, make such Distribution into an escrow account to be held in trust for the benefit of such holder and such Distribution shall not constitute property of the Estates.  Such Distribution shall be held in escrow until the disposition thereof shall be determined by order of the Bankruptcy Court or other court of competent jurisdiction or by written agreement signed by all of the interested parties to such dispute.

(n)     Resignation of Directors and Officers. Upon the Effective Date of the Plan, the Debtors' board of directors and officers shall be deemed to have resigned.

(o)     Resignation or Removal of the Trustee.  If the Trustee resigns or is removed, dissolves, or is incapacitated, the terms of section 1183 of the Bankruptcy Code shall govern regarding the designation of a successor Trustee, and following such designation, the successor Trustee, without further act, shall become fully vested with all of the rights, powers, duties, and obligations of his or her predecessor, with the same compensation of the predecessor Trustee pursuant to section 1183 of the Bankruptcy Code.

(p)     No Agency Relationship. The Trustee shall not be deemed to be the agent for any of the holders of Claims in connection with the funds held or distributed pursuant to the Plan.  The Trustee shall not be liable for any mistake of fact or law or error of judgment or any act or omission of any kind unless arising from gross negligence, willful misconduct, or breach of fiduciary duty.  The Trustee shall be indemnified and held harmless, including the cost of defending such claims and attorneys' fees in seeking indemnification, by the Estates against any and all claims arising out of each of their, respective, duties under the Plan, except to the extent their actions constitute gross negligence, willful misconduct, or breach of fiduciary duty.  The Trustee may conclusively rely, and shall be fully protected personally in acting upon any statement, instrument, opinion, report, notice, request, consent, order, or other instrument or document which they, respectively, believe to be genuine and to have been signed or presented by the proper party or parties.  The Trustee may also rely upon information previously generated by the Debtors and such additional information provided to each of them, respectively, by former affiliates of the Debtors.  The liability of the Trustee shall be capped at the amount of fees that the Trustee receives in connection with the Chapter 11 Cases.

# ARTICLE VIII.

## EFFECT OF THE PLAN ON CLAIMS INTERESTS AND CAUSES OF ACTION

**Section 8.1**    **Binding Effect.**

On and after the Confirmation Date, the provisions of the Plan shall bind any holder of a Claim against the Debtors who held such Claim at any time during the Chapter 11 Cases and their respective successors and assigns, whether or not the Claim of such holder is Impaired under the Plan and whether or not such holder has been deemed to accept the Plan.

**Section 8.2**    **Term of Injunctions or Stays.**

Unless otherwise provided in the Plan, all injunctions or stays provided for in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Chapter 11 Cases are closed.

**Section 8.3**    **Causes of Action.**

All preference or avoidance claims or actions of the Debtors, including, but not limited to any actions or claims arising under section 544, 547, 548 549 and 550 of the Bankruptcy Code and any other similar or corresponding claims or actions arising under state or any other law (collectively, the "Avoidance Actions"), in each case to the extent not included in the Acquired Assets, are hereby irrevocably and unconditionally waived and released.

**Section 8.4**    **Injunctions.**

(a)    <u>Satisfaction of Claims</u>. The treatment to be provided for Allowed Claims shall be in full satisfaction, settlement, and release of each such Claim.

(b)    <u>Scope of Injunction</u>. Except as otherwise provided in the Plan or the Confirmation Order, as of the Effective Date, all Persons that hold a Claim are permanently enjoined from taking any of the following actions against the Debtors, their affiliates, the Trustee or any present and former directors, officers, trustees, agents, attorneys, advisors, members, or employees of the Debtors, their affiliates, the Trustee or any of their respective successors or assigns, or any of their respective assets or properties, on account of any Claim: (i) commencing or continuing in any manner any action or other proceeding with respect to a Claim or based upon a theory which arises out of such holder's Claim; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree or order with respect to a Claim; (iii) creating, perfecting or enforcing any Lien or Encumbrance with respect to a Claim; (iv) asserting a setoff, right of subrogation or recoupment of any kind with respect to a Claim, the Assets or other property of the Estates; and (v) commencing or continuing any action that does not comply with or is inconsistent with the Plan. Nothing shall preclude the holder of a Claim from pursuing any applicable insurance after the Chapter 11 Cases are closed, from seeking discovery in actions against third parties or from pursuing third party insurance that does not cover Claims against the Debtors. For the avoidance of doubt, nothing in this Injunction shall limit the rights of a holder of a Claim to enforce the terms of the Plan.

(c)     <u>Release of Collateral</u>.  Except as expressly provided herein: (i) each holder of (a) an Allowed Secured Claim;  and/or (b) an Allowed Claim that is purportedly secured, on the Effective Date shall (x) turn over and release to the Debtors any and all property that secures or purportedly secures such Claim;  and (y) execute such documents and instruments as the Debtors or the Trustee, as applicable, require to evidence such claimant's release of such property;  and (ii) on the Effective Date, all Claims, rights, title, and interest in such property shall revert to the Debtors, free and clear of all Claims, including (without limitation) Liens, charges, pledges, Encumbrances, and/or security interests of any kind.  No Distribution shall be made to or on behalf of any holder of such Claim unless and until such holder executes and delivers to the Trustee such release of Liens.  Any such holder that fails to execute and deliver such release of Liens within sixty (60) days of any demand thereof shall be deemed to have no further Claim and shall not participate in any Distribution hereunder.  Notwithstanding the immediately preceding sentence, a holder of a Disputed Claim shall not be required to execute and deliver such release of Liens until the time such Claim is Allowed or disallowed.

(d)     <u>Cause of Action Injunction</u>.  On and after the Effective Date, all Persons other than the Trustee will be permanently enjoined from commencing or continuing in any manner any action or proceeding (whether directly, indirectly, derivatively, or otherwise) on account of, or respecting any Claim, debt, right, or Cause of Action that the Trustee retains authority to pursue in accordance with the Plan.

**Section 8.5    <u>Exculpation</u>.**

**Except as otherwise set forth in the Plan, neither the Debtors nor the Exculpated Parties shall have or incur any liability to any Person or entity for any action taken or omitted to be taken between the Petition Date and the Effective Date in connection with or related to the formulation, preparation, dissemination, implementation, confirmation, or consummation of the Plan, the Confirmation Order, the Asset Purchase Agreement or any contract, release, or other agreement or document created or entered into, or any other action taken or omitted to be taken in connection with the Plan, the administration of the Plan or property to be distributed pursuant to the Plan, the Sale, and actions taken or omitted to be taken in connection with the Chapter 11 Cases or the operations, monitoring, or administration of the Debtors during the Chapter 11 Cases; *provided, however*, that such action taken or not taken by such Person or Entity was specifically on behalf of the Debtors and in conjunction with the Chapter 11 Cases, *provided further*, *however* that the Exculpated Parties did not engage in fraud, gross negligence, willful misconduct, or acts performed outside the scope of section 1184 of the Bankruptcy Code not authorized by the Bankruptcy Court.  The Trustee shall have no liability for any action taken or omitted to be taken in connection with or related to the winding down and post-confirmation administration of the Estates, except for (i) fraud, gross negligence, or willful misconduct, and (ii) solely in the case of attorneys, to the extent that such exculpation would violate any applicable professional disciplinary rules, including Rule 1.8(h) of the New York State Rules of Professional Conduct.**

**Section 8.6    Compromise of Controversies.**

Pursuant to Bankruptcy Rule 9019, and in consideration for the classification, distribution, and other benefits provided under the Plan, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and controversies resolved pursuant to the Plan, including, without limitation, all Claims arising prior to the Effective Date, whether known or unknown, foreseen or unforeseen, asserted or unasserted, arising out of, relating to, or in connection with the business or affairs of or transactions with the Debtors. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of each of the foregoing compromises or settlements, and all other compromises and settlements provided for in the Plan, and the Bankruptcy Court's findings shall constitute its determination that such compromises and settlements are in the best interests of the Debtors, the Estates, Creditors, and other parties in interest, and are fair, equitable, and within the range of reasonableness.

**Section 8.7    Releases by the Debtors.**

**Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, for good and valuable consideration, on and after the Effective Date, each Released Party and their respective advisors, attorneys, and Representatives of any professional employed by any of them is deemed released, solely in their capacity in acting on behalf of the Debtors or their Estates, by the Debtors and their Estates from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims, asserted on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, whether for tort, contract, violations of federal or state securities laws, or otherwise, that the Debtors or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Chapter 11 Cases, the subject matter of, any Claim or Interest that is treated in the Plan, the negotiation, formulation, or preparation of the Plan, the Confirmation Order, the Sale process, the Purchase Agreement or related agreements, instruments, or other documents, or upon any other act or omission, transaction, agreement, event, or other occurrence relating to the Debtors, in connection with the Chapter 11 Cases, *provided, however*, that the Released Parties did not engage in fraud, willful misconduct, or gross negligence, taking place on or before the Effective Date.**

**Section 8.8    Post-Confirmation Activity.**

As of the Effective Date, the Trustee may conclude the winding down of the Debtors' affairs and administer estate assets, without supervision of the Bankruptcy Court, other than those restrictions expressly imposed by the Bankruptcy Code, the Plan, and the Confirmation Order, as applicable. Without limiting the foregoing, the Trustee may pay any charges it incurs for taxes, professional fees, disbursements, expenses, or related support services, in connection with their respective duties, after the Effective Date without application to and approval of the Bankruptcy Court.

# ARTICLE IX.

## EXECUTORY CONTRACTS

**Section 9.1**     <u>**Executory Contracts and Unexpired Leases.**</u>

(a)     <u>Assumption Procedures.</u>  The Debtors will file the Assumption Schedule with the Court no later than five (5) business days prior to the Confirmation Hearing and concurrently serve notice of such filing, by email or overnight mail, upon all counter-parties to the Assigned Contracts.  Such Assumption Schedule is attached as Schedule 9.1 hereto.  Notwithstanding anything to the contrary, Buyer may cause the Debtors to amend such Assumption Schedule at any time prior to three (3) days prior to the closing of the Sale.

The Assumption Schedule shall identify the proposed Assigned Contracts and the corresponding Cure Amounts required by section 365 of the Bankruptcy Code, if any. All non-debtor parties to the Assigned Contracts shall have ten (10) business days following service of the Assumption Schedule (or any amendment to such schedule), to file an objection (an "Assumption Objection") to the proposed assumption and assignment of any Assigned Contract or any Cure Amount listed for an Assigned Contract.  Any party filing an Assumption Objection shall state with specificity the basis of the objection and what Cure Amount it asserts, and shall include appropriate documentation in support thereof.

If an Assumption Objection is timely filed and not consensually resolved, this Court shall hold a hearing with respect to such Assumption Objection at such date as this Court shall designate.  No Assigned Contract that is the subject of any such Assumption Objection shall be assumed by the Debtors and assigned to Buyer until such Assumption Objection is resolved, and in any event shall be subject to Buyer's right pursuant to the Asset Purchase Agreement to exclude such Assigned Contract from the Sale to the extent Buyer is not satisfied with the final Cure Amount.

(b)     <u>Rejection Procedures.</u> To the extent not previously rejected, on the Effective Date, but subject to the occurrence of the Effective Date, all executory contracts and unexpired leases of the Debtors entered into prior to the Petition Date that have not previously been assumed or rejected, or are not set forth on the Assumption Schedule to be assumed and assigned to Buyer in conjunction with the Sale and Confirmation Order, shall be deemed rejected by the Debtors pursuant to the provisions of section 365 of the Bankruptcy Code.  Following the Effective Date, any Assigned Contract Buyer elects to exclude from the Sale pursuant to the terms of the Asset Purchase Agreement shall be deemed rejected as of the date of such election.

(c)     <u>Effect of Confirmation Order.</u> Entry of the Confirmation Order shall constitute an order of the Bankruptcy Court approving, subject to and upon the occurrence of the Effective Date, the assumptions, assumptions and assignments, or rejections of any executory contracts and unexpired leases assumed, assumed and assigned, or rejected pursuant to the Plan. Any motions to assume, assume and assign, or reject any executory contracts or unexpired leases that is pending on the Effective Date shall be subject to approval by the Bankruptcy Court on or after the Effective Date by a Final Order but may be withdrawn, settled, or otherwise prosecuted

by the Debtors, with any such disposition to be deemed to effect an assumption, assumption and assignment, or rejection, as applicable, as of the Effective Date.

To the maximum extent permitted by law, to the extent any provision in any executory contract or unexpired lease assumed or assumed and assigned pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such executory contract or unexpired lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-debtor party thereto to terminate such executory contract or unexpired lease or to exercise any other default-related rights with respect thereto.

**Section 9.2**     **Rejection Damages Bar Date.**

If rejection by the Debtors, pursuant to the Plan, of an executory contract or unexpired lease, results in a Claim, then such Claim shall be forever barred and shall not be enforceable against the Debtors, their Estates, the Trustee unless a proof of claim is filed with the Clerk of the Bankruptcy Court and served upon the Debtors and the Trustee, as applicable, not later than thirty (30) days after the date of service of notice of entry of the Confirmation Order, or such other period set by the Bankruptcy Court.

**Section 9.3**     **Effect of Post-Confirmation Rejection.**

The entry by the Bankruptcy Court on or after the Confirmation Date of an order authorizing the rejection of an executory contract or unexpired lease of the Debtors entered into prior to the Petition Date shall result in such rejection being a prepetition breach under sections 365(g) and 502(g) of the Bankruptcy Code.

## ARTICLE X.

## CONDITIONS TO CONFIRMATION AND OCCURRENCE OF EFFECTIVE DATE

**Section 10.1     Conditions to Confirmation.**

The Plan may not be confirmed unless the Confirmation Order is entered in a form reasonably acceptable to the Plan Proponent and the Buyer.

**Section 10.2     Conditions to Occurrence of Effective Date.**

The Effective Date for the Plan may not occur unless each of the conditions set forth below is satisfied. Any one or more of the following conditions may be waived in whole or in part at any time by the Plan Proponent with the consent of Buyer:

(a)     The Bankruptcy Court shall have entered the Confirmation Order and it shall have become a Final Order;

(b)     The Confirmation Order shall provide for approval of the Sale in accordance with the terms of the Asset Purchase Agreement;

(c)     The Confirmation Order shall provide for the releases, injunctions and exculpation of the Persons provided for in the Plan; and

(d)     The Debtors and Buyer shall be prepared, simultaneous with the occurrence of the Effective Date and pursuant to the terms of the Asset Purchase Agreement, to consummate the Sale.

**Section 10.3     Effect of Nonoccurrence of the Conditions to Occurrence of Effective Date.**

If each of the conditions to the occurrence of the Effective Date has not been satisfied or duly waived on or before the date which is no later than the first Business Day after fourteen (14) days after the Confirmation Date, or by such later date as is approved, after notice and a hearing, by the Bankruptcy Court, then upon motion by any party in interest made before the time that each of the conditions has been satisfied or duly waived, the Confirmation Order may be vacated by the Bankruptcy Court; *provided, however*, that, notwithstanding the filing of such a motion, the Confirmation Order shall not be vacated if each of the conditions to occurrence of the Effective Date is either satisfied or duly waived before the Bankruptcy Court enters an order granting the relief requested in such motion.  If the Confirmation Order is vacated pursuant the Plan, then the Plan shall be null and void in all respects, and nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims by or against the Debtors, or (b) prejudice in any manner the rights of the Debtors or of any other party in interest.

## ARTICLE XI.

## CONFIRMABILITY AND SEVERABILITY OF A PLAN

**Section 11.1     Confirmability and Severability of Plan.**

Subject to the Plan, the Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan.  If the Debtors revoke or withdraw the Plan, then nothing contained herein or in the Plan shall be deemed to constitute a waiver or release of any Claims by or against the Debtors, or to prejudice in any manner the rights of the Debtors or any Persons in any further proceedings involving the Debtors. A determination by the Bankruptcy Court that the Plan is not confirmable pursuant to section 1129 of the Bankruptcy Code shall not limit or affect the Debtors' ability to modify the Plan to satisfy the applicable confirmation requirements of section 1129 of the Bankruptcy Code.  Each provision of the Plan shall be considered severable and, if for any reason any provision or provisions therein are determined to be invalid and contrary to any existing or future law, the balance of the Plan shall be given effect without relation to the invalid provision, to the extent it can be done without causing a material change in the Plan.

*[\*\*\*Remainder of Page Left Intentionally Blank\*\*\*]*

# ARTICLE XII.

## ADMINISTRATIVE PROVISIONS

### Section 12.1    Retention of Jurisdiction.

Notwithstanding confirmation of the Plan or occurrence of the Effective Date, the Bankruptcy Court shall retain jurisdiction and authority for all purposes permitted under applicable law, including, without limitation, the following purposes:

(a)    To determine any motion, adversary proceeding, Avoidance Action, application, contested matter, or other litigated matter pending on or commenced after the Confirmation Date;

(b)    To hear and determine applications for the assumption or rejection of executory contracts or unexpired leases and the allowance of Claims resulting therefrom;

(c)    To ensure that Distributions to holders of Allowed Claims are accomplished as provided herein;

(d)    To hear and determine objections to the allowance of Claims, whether filed, asserted, or made before or after the Effective Date, including, without limitation, to hear and determine objections to the classification of Claims and the allowance or disallowance of Disputed Claims, in whole or in part;

(e)    To consider Claims or the allowance, classification, priority, compromise, estimation, or payment of any Claim;

(f)    To enter, implement, or enforce such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

(g)    To issue injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Person with the consummation, implementation, or enforcement of the Plan, the Confirmation Order or any other order of the Bankruptcy Court;

(h)    To hear and determine any application to modify the Plan, to remedy any defect or omission or reconcile any inconsistency in the Plan, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(i)    To hear and determine all matters relating to the distribution of the Sale Proceeds;

(j)    To hear and determine all Professional Fee Claims;

(k)    To hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, the Confirmation Order or any

transactions or payments contemplated hereby or thereby, or any agreement, instrument, or other document governing or relating to any of the foregoing;

(l)     To take any action and issue such orders as may be necessary to construe, enforce, implement, execute, and consummate the Plan, including any release, exculpation or injunction provisions set forth herein, or to maintain the integrity of the Plan following consummation;

(m)     To determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(n)     To hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

(o)     To enter a final decree closing the Chapter 11 Cases;

(p)     To recover all Assets of the Debtors and property of the Estates, wherever located;

(q)     To hear and determine any matters for which jurisdiction was retained by the Bankruptcy Court pursuant to prior orders; and

(r)     To hear and determine any other matters related hereto and not inconsistent with the Bankruptcy Code, title 28 of the United States Code, and other applicable law.

## Section 12.2     Governing Law.

Except to the extent the Bankruptcy Code, Bankruptcy Rules, or other federal laws apply, the rights and obligations arising under the Plan shall be governed by the laws of the State of New York, without giving effect to principles of conflicts of law of New York.

## Section 12.3     Effectuating Documents, Further Transactions.

The Debtors or the Trustee, as applicable, shall be authorized to execute, deliver, file, or record such contracts, instruments, releases, and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

## Section 12.4     Waiver of Bankruptcy Rules 3020(e) and 7062.

The Debtors may request that the Confirmation Order include (i) a finding that Bankruptcy Rule 7062 shall not apply to the Confirmation Order, and (ii) authorization for the Debtors or the Trustee, as applicable, to consummate the Plan immediately after entry of the Confirmation Order.

**Section 12.5    Discharge.**

In the event this Plan is confirmed under section 1191(a) of the Bankruptcy Code, as of the Effective Date, the Debtors will be discharged from any debt that arose before Confirmation, to the extent specified in section 1141(d)(1)(A) of the Bankruptcy Code, except that the Debtors will not be discharged of any debt imposed under the Plan.

In the event this Plan is confirmed under section 1191(b) of the Bankruptcy Code, Confirmation does not discharge any debt provided for in this Plan until the Bankruptcy Court grants a discharge on completion of all payments due under the Plan or as otherwise provided in section 1192 of the Bankruptcy Code.

**Section 12.6    Headings.**

The headings used in the Plan are inserted for convenience only, and neither constitute a portion of the Plan nor in any manner affect the construction of provisions of the Plan.

**Section 12.7    Governmental Carve-Out.**

Nothing in the Plan or the Confirmation Order shall (i) effect a release of any Claim of, (ii) enjoin from bringing any Claim, suit, action or other proceedings by, or (iii) exculpate any party from any liability to, the United States Government or any of its agencies or any state or local government within the United States, arising under (v) the federal securities laws, (w) the Employment Retirement Income Security Act of 1974, as amended, (x) the Internal Revenue Code, (y) the environmental laws or (z) any criminal laws of the United States.

**Section 12.8    Disposal of Books and Records.**

The Debtors or Trustee's rights, as applicable, to seek authorization from the Bankruptcy Court for the destruction of books and records prior to the expiration of any statutory period requiring that such records be maintained are preserved.

**Section 12.9    Amendments.**

The Debtors may alter, amend, or modify the Plan under section 1193(a) of the Bankruptcy Code at any time prior to the Confirmation Date. After the Confirmation Date and prior to substantial consummation of this Plan as defined in section 1101(2) of the Bankruptcy Code, the Debtors may under section 1193(b) of the Bankruptcy Code, institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in this Plan or the Confirmation Order, and such matters as may be necessary to carry out the purposes and effects of the Plan.

**Section 12.10   Successors and Assigns.**

The rights, benefits, and obligations of any Person named or referred to in the Plan shall be binding upon, and shall inure to the benefit of, the heir, executor, administrator, successor, or assign of such Person.

**Section 12.11**   <u>Confirmation Order and Plan Control.</u>

To the extent the Confirmation Order and/or the Plan is inconsistent with any agreement entered into between the Debtors and any third party, the Plan controls any such agreements, and the Confirmation Order controls the Plan. Notwithstanding anything to the contrary in this Plan, in the event of any inconsistency between the Asset Purchase Agreement and this Plan, any Plan Supplement, or any contract, instrument, release, or other agreement or document created pursuant to the Plan or any Plan Supplement, the Asset Purchase Agreement shall control solely with respect to the assumption and assignment of Assigned Contracts, the Acquired Assets, the Excluded Assets (as defined in the Asset Purchase Agreement), the Assumed Liabilities and Excluded Liabilities (each as defined in the Asset Purchase Agreement), the conditions precedent to the obligations of the Debtors and Buyer to consummate the Sale pursuant to the Asset Purchase Agreement, and any other matter between or among Buyer and the Debtors or the Trustee, or their successors and permitted assigns, or any other Person or Entity, relating to the Asset Purchase Agreement or the Sale.

**Section 12.12**   <u>Further Action.</u>

Nothing contained in the Plan will prevent the Debtors or the Trustee, as applicable, from taking such actions as may be necessary to consummate the Plan even though such actions may not be specifically provided for within the Plan.

**Section 12.13**   <u>Exhibits.</u>

All Exhibits to the Plan are incorporated by reference and are intended to be an integral part of this document as though fully set forth in the Plan.

**Section 12.14**   <u>Notices.</u>

Any notice required or permitted to be provided under the Plan, unless otherwise provided herein, shall be in writing and served by either (a) certified mail, return receipt requested, postage prepaid, (b) hand delivery, or (c) overnight delivery service, postage prepaid, and addressed as follows:

<u>For the Debtors</u>:

VTES, INC. *et al.*,
2005 De La Cruz Blvd, Suite #111
Santa Clara, California 95050
Attn:   Mr. Ravi Puvvala

<u>Counsel to the Debtors</u>:

Griffin Hamersky LLP
420 Lexington Avenue, Suite 400
New York, New York 10170
Attn:  Scott A. Griffin

**For the Trustee**:

[To Be Determined]



**For the United States Trustee**:

William K. Harrington
United States Trustee
United States Department of Justice
201 Varick Street, Room 1006
New York, New York 10014
Attn:  Brian Masumoto, Esq.

**Section 12.15   Substantial Consummation.**

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101(2) and 1127(b) of the Bankruptcy Code.

**Section 12.16   Deemed Acts.**

Whenever an act or event is expressed under the Plan to have been deemed done or to have occurred, it shall be deemed to have been done or to have occurred without any further act by any party, by virtue of the Plan and the Confirmation Order.

DATED:    New York, New York
                    December 29, 2020


                                                    VTES, INC *et al*.
                                                    Debtors and Debtors in Possession

                                                    By:

                                                    /s/ *Ravi Puvvala*
                                                    Ravi Puvvala
                                                    Chief Executive Officer

**Schedule 9.1**

**Assumption Schedule**

[TBD]